# Gilman, Sons & Co. *v.* New Orleans and Selma Railroad Company and Immigration Association.

*Bill in Equity by Judgment Creditor of Insolvent Railroad Corporation; Cross-Bill between Holders of State-Indorsed Railroad Bonds.*

1. *Errors not prejudicial to appellant.*—An appellant can only complain of errors which are prejudicial to him; hence, in a chancery cause, a controversy arising between two or more defendants under a cross-bill, one of them can not assign as error the dismissal of the original bill.

2. *Answer and cross-bill, without and under statutory provisions.*—In the absence of statutory provisions, an answer and a cross-bill are separate and distinct modes of defense, and can not be blended in one pleading; and the statute which authorizes a defendant to embrace in his answer matters which might be made the subject of a cross-bill, and to have it heard and considered as a cross-bill (Code, §§ 3801-04), applies only to those cases in which relief is sought against the complainant in the original bill, and does not authorize the answer of one defendant to be converted into a cross-bill as against another.

3. *Cross-bill between co-defendants.*—Independently of statutory provisions, a cross-bill may be maintained by one or more of several defendants, asking relief against the original complainant and the other defendants; and when such a cross-bill has been filed by one defendant, bringing the entire subject of litigation before the court, a second cross-bill by another defendant is unnecessary, and is properly dismissed.

4. *State indorsement of railroad bonds; bonds for first twenty miles of road.*—Under the statute approved February 21st, 1870, entitled "An

[Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.]

act to furnish the aid and credit of the State of Alabama for the purpose of expediting the construction of railroads " (Session Acts 1869–70, pp. 149–57), it was contemplated that the first twenty miles of the railroad should be completed and equipped from the resources of the corporation, before any of its bonds should be indorsed by the State, and that the indorsed bonds should be used and applied in the further construction of the road; and the bonds referring on their face to the statute under which they were indorsed, every person taking them from the railroad company was put on inquiry, and was chargeable with notice of the requirements of the statute, of the relation of the State as indorser, and of the uses and purposes for which the company could legally transfer them.

5. *Same; misapplication of said bonds.*—The company having transferred its bonds to the contractor engaged in the construction of the first twenty miles of its road, and, after procuring the State's indorsement on the completion of said twenty miles, again delivered them to him in payment of the company's debt to him; such use of them being unauthorized, and fraudulent as against the State, no liability rested on it by virtue of its indorsement, while the bonds remained in the hands of said contractor, or were in the hands of any other person chargeable with knowledge of the misapplication.

6. *Same; rights of bona fide holder.*—But, such indorsed bonds being negotiable instruments, and governed by the same rules as all other commercial paper, the State would become liable, as an accommodation indorser, to any *bona fide* holder who acquired them for value, in the usual course of business, without knowledge or notice, actual or constructive, of the misapplication by the company or its immediate transferree.

7. *Same; burden of proof as to character of transfer.*—When a subsequent holder of such bonds seeks to enforce the State's liability as indorser, the original misappropriation of them being shown, the law casts on him the burden of proving that be acquired them in good faith, for value, and in the usual course of business.

8. *Same; what is purchase for value, and in usual course of business.* The sale or exchange of such indorsed bonds for shares of stock in another railroad corporation, or in a joint-stock company or corporation engaged in the business of constructing railroads by contract, is an ordinary commercial transaction; and in determining whether the purchase is for value, the safer doctrine is, when no question of usury is involved, that the amount of the consideration, value being parted with, is only material as bearing on the question of notice.

9. *Same; proof of notice, or want of notice.*—In such case, the presumption is of a want of notice, since it is not probable, though possible, that notice of the original fraud or illegality would be communicated to a subsequent holder, thereby defeating the transfer; and the burden of proving notice resting on the party who assails the title of the holder, it is not enough to show only that he acquired the bonds under circumstances which would have excited, in the mind of prudent man, suspicions as to the title of the party from whom he purchased.

10. *Subrogation of holders of indorsed bonds, to State's statutory lien and priority.*—The holders of such indorsed bonds who have acquired them in good faith, for valuable consideration, and in the usual course of business, are entitled to be subrogated to the statutory lien and priority of the State, on the railroad company becoming insolvent, and making default in the payment of the bonds according to their terms; and this subrogation may be declared in a suit between the holders of such bonds, some of whom are not entitled to share in the protection given to the others, and although the State is not a party and can not be sued.

APPEAL from the City Court of Selma, sitting in Equity.
HEARD before the Hon. W. C. WARD, as special judge, selected

by the parties on account of the disqualification of the presiding judge of the court.

The original bill in this case was filed on the 10th October, 1877, by Richard M. Robertson, as a judgment-creditor of the New Orleans and Selma Railroad Company and Immigration Association, a domestic corporation, which was alleged to be insolvent, and against which executions on complainant's judgments had been returned "No property found;" against the said corporation, and against T. H. DuPuy and others, who were alleged to be in control and possession of the property and railroad of the corporation; and against Gilman, Sons & Co., a firm doing business in New York city, as the holders of certain mortgage bonds which had been issued by the corporation; and against the Union Trust Company, a foreign corporation, organized and doing business in the city of New York, as the trustee in the mortgage. Its object and prayer was to set aside the mortgage, as an incumbrance on the property of the corporation, which would prevent it from bringing an adequate price under an execution sale; or to have the mortgage bonds, if any of them were lawful claims against the property, declared inferior to the lien of the complainant's judgments, and to have the property sold for the satisfaction of his debt and the other valid claims which might be presented and proved. An amended bill was afterwards filed, bringing in as defendants the several persons composing the firm of Morton, Bliss & Co., a partnership doing business in the city of New York, and the personal representative of David Crawford, deceased, as the holders and claimants of other mortgage bonds of the corporation.

The defendant corporation was chartered by an act of the General Assembly of Alabama, approved February 23d, 1866, under the name of the New Orleans and Selma Railroad Company, and was authorized to build a railroad between Selma and New Orleans; and its name was changed, by an act approved December 22d, 1868, by adding the words "*and Immigration Association.*" The corporation was duly organized under its charter, the complainant in the original bill being a large stockholder and its first president. The first twenty miles of the railroad, commencing at Selma, were built by the defendant DuPuy, under a contract with the corporation, entered into on the 22d February, 1870. By the terms of this contract, as originally entered into, DuPuy undertook to construct the entire road, at the following compensation per mile: $16,000 of the first-mortgage bonds of the corporation, indorsed by the State as then provided by law; $14,000 of its second-mortgage bonds; 250 shares of its capital stock, of $100 each, and certain cash subscriptions. The act of the General Assembly approved February 21st, 1870, having required that twenty miles of its

road should be completed, before a railroad company should be entitled to have any of its bonds indorsed by the State, and that the bonds should then be indorsed, to the amount of $16,000 per mile, for said twenty miles, and for each continuous section of five miles when completed; the contract between DuPuy and the company was modified, on the 16th May, 1870, and it was stipulated that his compensation should be, for the first twenty miles, $16,000 per mile of the unindorsed bonds of the company, 300 shares of its capital stock, $140,000 subscribed by Dallas county, and other cash subscriptions; and on the completion of the first twenty miles, as required by the said act of February 21st, 1870, the company agreed, "for the purpose of building and expediting the construction and equipment of the second section of twenty miles of said road, to advance and pay to the said party of the second part [DuPuy] $320,000 in the mortgage bonds of said company, indorsed by the State of Alabama," and at that rate for each continuous five miles.

On the 16th July, 1870, the railroad company executed a mortgage, or deed of trust, by which it conveyed to the Union Trust Company, of New York, its franchise, road and property, to secure bonds which it proposed to issue for the purpose of raising money, as recited in the resolutions of the company, which were set out in full in the mortgage, "to enable this company to construct and equip its road beyond the first twenty miles, that much having been already provided for;" the bonds to be in a prescribed form, for $1,000 each, payable on the 1st July, 1895, with interest at the rate of eight per-cent. *per annum*, payable semi-annually, at the office or agency of the corporation in the city of New York; each containing on its face the words "*To be indorsed by the State of Alabama*," and a recital in these words: "This is one of a series of bonds, of like tenor, date and amount, numbered consecutively from one upwards, and limited to sixteen thousand dollars per mile of completed and equipped railroad in the State of Alabama; secured by a mortgage, bearing even date herewith, of the railroad, with its equipments and appurtenances, and franchises of the said corporation which relate thereto; issued under the provisions of an act of the General Assembly of Alabama, entitled 'An act to furnish the aid and credit of the State of Alabama for the purpose of expediting the construction of railroads,' approved February 21st, 1870; all secured by a first lien, provided for in said act, on the railroad of said company, its equipments, and all other property relating thereto, including the franchise of the company, with power of sale in case of default; and by indorsement of the State of Alabama, made under authority, and in pursuance of the act of the General Assembly aforesaid."

Of the bonds provided for in this mortgage, 320 were issued,

of even date with the mortgage, were delivered to DuPuy by the company; and in June, 1871, the first twenty miles of the road having been completed, he re-delivered them to the company, in order that the State's indorsement might be procured; and the indorsement having been made, after full compliance with the provisions of the statute, the bonds were again delivered to DuPuy, and were transferred by him to David Crawford and the persons composing the firm of Morton, Bliss & Co., in payment of debts which he had contracted with them for iron and materials purchased and used in the construction and equipment of said twenty miles of the road.  Of the bonds which Crawford received, he transferred 58, numbered from 263 to 320, to Gilman, Sons & Co., in exchange for "Des Moines Valley Construction Company" stock, and "Des Moines Valley Common" stock.  This contract was made on the 17th October, 1870, before the bonds had been indorsed by the State; and it was stipulated in the contract, as shown by the memorandum, that the bonds were "to be guaranteed by the State of Alabama, and to bear eight per-cent coupons; interest to begin January 1st, 1871, and bonds to be delivered within about sixty days."  The bonds were actually delivered, and the contract consummated July 22d, 1871.

An answer to the bill was filed by Gilman, Sons & Co., claiming to be *bona fide* purchasers of the 58 bonds held by them, denying the validity of the other bonds in the hands of Crawford and Morton, Bliss & Co., and insisting that, in any event, they were entitled to priority over the holders of those bonds.  They incorporated in their answer a cross-bill, making the original complainant, Robertson, Crawford, Morton, Bliss & Co., DuPuy, and the railroad corporation, parties defendants thereto; and praying that the equities and relative priorities of the parties might be adjusted, an account taken, and the railroad sold for the satisfaction of the debts found due.  A demurrer to this cross-bill was filed by Morton, Bliss and their associates, on the ground that the statute did not authorize an answer to be joined with a cross-bill as between co-defendants; and, having answered the original bill, they filed a formal cross-bill, making all the parties interested defendants thereto, and praying relief as follows:  "(1.) That the validity and order of priority of the several and respective liens and claims of the parties to this action, upon and against the said railroad and other mortgaged property and premises hereinbefore described, may be determined and decreed.  (2.) That it may be ascertained, determined and decreed, who are the *bona fide* holders and owners of the bonds hereinbefore referred to; which are outstanding, and to what extent and for what sums the same are valid obligations, or are secured by the said deed of trust and statutory mortgage

[Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.]

hereinbefore referred to, and what are the rights respectively of the owners of said bonds. (3.) That the said railroad, and all the property embraced in and described or referred to in said deed of trust, including right of way, property, franchises, capital stock, rights and appurtenances, and all and singular the locomotives, cars, machinery, fixtures, implements, chattels and effects, of every nature and kind whatever, in any wise appertaining to said railroad, or belonging to said corporation, be sold, in such manner as this court shall direct. (4.) That an account be taken in respect to the money due upon said bonds secured by said deed of trust and statutory mortgage, for principal and interest; that the holders thereof be ascertained; that the proceeds of sale be applied, under the direction of the court, to the payment and discharge of the said several sums; and that this suit and the said original suit may constitute but one cause, and as such be heard together. (5.) And that your orators may have such other and further relief in the premises as the nature of the case may require," &c.

On final hearing, on pleadings and proof, the special judge sustained a demurrer to the cross-bill of Gilman, Sons & Co., and dismissed it; and he also dismissed the original bill, holding that the complainant showed no right to relief, either against the bondholders, or against DuPuy. But he retained the cross-bill of Morton, Bliss *et al.*, as being in the nature of an original bill; and rendered a decree under it, declaring that, while none of the bondholders were *bona fide* purchasers for value as against the State, they were entitled to have the mortgage foreclosed by a sale of the property, and to share equally in the proceeds of the sale. Gilman, Sons & Co. appeal from this decree, and here make thirty-six assignments of error; the principal assignments being, the dismissal of their cross-bill, the decree rendered under the cross-bill of Morton, Bliss *et al.*, the refusal to decree priority to the appellants over the other bondholders, and the rulings on numerous exceptions to evidence.

R. M. WILLIAMSON, and J. T. HOLTZCLAW, with whom were E. W. PETTUS and D. S. TROY, for the appellants.—The bonds, on their face, are such bonds as the statute contemplated; and the State's indorsement was made on proof of full performance of all the conditions prescribed, and strict compliance with all the statutory requisitions. They are, and were intended to be, negotiable instruments; and when thus put on the market, a *bona fide* purchaser for value was not bound to inquire into these matters, but might rely on the security of the State's indorsement.—*Plock & Co. v. Cobb*, 64 Ala. 127; *Pond v. Lockwood*, 8 Ala. 669; *Winston v. Westfeldt*, 22 Ala. 760. The misapplication of the bonds by DuPuy did not invalidate them

[Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.]

as securities governed by the commercial law, though it would prevent any one who participated in such misapplication, or who acquired them with knowledge thereof, from enforcing any liability against the State as indorser. This is the position occupied by Morton, Bliss & Co., and by Crawford : they received the bonds from DuPuy, in payment of their debts contracted for materials and supplies sold and furnished to build the first twenty miles of road, knowing that they could only be legally applied to the further extension of the road. But Crawford contracted to sell Gilman, Sons & Co. bonds "to be indorsed by the State of Alabama;" and when he delivered the bonds under his contract, they were so indorsed. His contract was a guaranty of the indorsement; and to permit him now to assail the validity of the indorsement, would enable him to perpetrate a fraud on the purchasers.—*Emanuel v. Atwood*, 6 Porter, 384 ; 1 Dan. Neg. Instruments, 752–5. The appellants, as purchasers, are directly injured by this attempted fraud ; since, if the bonds had not been misapplied, there would now be forty (instead of twenty) miles of road completed and equipped, and subject to the lien of the mortgage. But Gilman, Sons & Co. are not affected by the infirmity which attached to the bonds while in the hands of Crawford, and which still attaches to those held by his administrator, and by Morton, Bliss *et al.* They acquired their bonds in good faith, for value, and in the usual course of business. The *onus* was on them to show that they paid value, before maturity, and in the usual course of trade ; and these facts are affirmatively shown. The *onus* then devolved on the adverse party, to show notice or knowledge of the infirmity of the paper, or facts which should have put them on inquiry ; and this is not proved. As *bona fide* holders of these indorsed bonds, the appellants are entitled to priority over the other bondholders, and to be subrogated to the State's prior lien.—*Colt v. Barnes*, 64 Ala. 108 ; *Knighton v. Curry*, 62 Ala. 404.

BROOKS & ROY, with whom was S. F. RICE, *contra.*—1. *As to the pleadings.* The original bill was properly dismissed, because the complainant was not entitled to any relief as against the bondholders or the railroad company. The cross-bill of Gilman, Sons & Co. was defective in form and parties ; and being also unnecessary, after the cross-bill of Morton, Bliss *et al.* was filed, it was properly dismissed. The cross-bill of Morton, Bliss *et al.* was in proper form, brought in all the parties interested, and presented the entire subject of litigation for decision ; and it was properly retained, notwithstanding the dismissal of the original bill.—Cooper's Dan. Ch. Pl. 1550, 1554, notes ; Story's Eq. Pl. § 398 ; 2 Barb. Chan. Pr. §§ 128–9 ;

*Wickliffe v. Clay* 1 Dana, 589; *Madison v. Wallace*, 2 Dana, 63; *Winn v. Dillard*, 60 Ala. 369.

2. *As to the status of the bonds as against the railroad company and its property.* The bonds all bear the same date, are secured by the same mortgage, refer to the same statute, were issued by the company at the same time, delivered to DuPuy in payment of his debt, and by him negotiated to Crawford and Morton, Bliss & Co. Their *status* is not affected by the recital in the mortgage of the company's intention to issue them for the further construction of the road beyond the first twenty miles; nor by DuPuy's stipulation in his contract to apply them in that manner. As against the company, that stipulation was without consideration, and he could successfully defend against any action for its breach.—*Overdeer v. Wiley, Banks & Co.*, 30 Ala. 709. The fact that the bonds were hypothecated, or held as collateral security, would not affect the right of the holders to foreclose the mortgage.—Jones on Railroad Securities, § 435. As against the company and all persons holding in privity with it, DuPuy in the first place, and Crawford and Morton, Bliss *et al.* in the second, were holders for value of the entire series of bonds; and the present holders, succeeding to their rights, may compel the specific application to the payment of the debt, whether the liability be referred to the contract or to the statute, and although the State may be discharged from liability as indorser.—*Kelly v. Trustees*, 58 Ala. 500; *Colt v. Barnes*, 64 Ala. 108; *Forrest v. Luddington*, 68 Ala. 1; *Cromwell v. County of Sac*, 6 Otto, 51; *Howell v. Western Railroad*, 4 Otto, 465; *Mayberry v. Morris*, 62 Ala. 113.

3. *As to the issue between Gilman, Sons & Co. and the other bondholders.* The mortgage and the bonds constitute but one contract, and are to be read and construed together. The mortgage contains an express stipulation, that the bonds are to be paid, "without priority to any holder," in full, or, if the property prove insufficient, "*pro rata*, so that no priority shall be given to any bond or bonds;" and in the absence of such a provision, the general rule of law would require equality. Morton, Bliss and their associates assert the validity and equality of the entire series of bonds, as against the corporation and its property; while Gilman, Sons & Co. claim to have acquired their bonds in such a manner as to give priority to them over the remainder of the series, and to entitle them to be subrogated to certain alleged rights of the State of Alabama. To support their position, they must show, first, that the State has property rights in the premises, which may be the subject of such subrogation; and, secondly, that their *status* entitles them to claim these rights to the exclusion of the other bondholders. Each

of these propositions, it is insisted, is without foundation in law or in fact.

(*a*) *As to the claim of subrogation.* If the rights of the parties are to be referred only to the statute, and to be determined by it alone, there can be no subrogation to the rights of the State, in the sense asserted by Gilman, Sons & Co.; because the public rights of the State can not be made the subject of subrogation; because the rights secured by the statute to the bondholders are direct and absolute rights of their own, and not rights which are to be worked out through the State, the mere stakeholder and trustee, in this respect, for the bondholders; and because the right of ultimate indemnity secured to the State is contingent (that is, dependent on its having been damnified by some payment as indorser), and subordinate to the paramount right of the bondholders to be paid in full, without which the State can not be damnified. The statutory mortgage and lien are created and declared for the benefit of the bondholders—"for the payment of said bonds by said company, with the interest thereon as it becomes due;" "for the payment of said bonds indorsed for the company, as provided in this act, and for the interest accruing on said bonds;" "to secure the payment of said bonds, with the interest thereon, and to indemnify the State against any loss on account of the indorsement of said bonds." The statute simply makes the State a trustee for the bondholders, vests it with certain powers, and imposes on it certain duties, to be exercised and performed for the benefit of the bondholders in the first instance, and ultimately for its own protection and indemnity. There is no room for the application of the doctrine of subrogation, as applied between sureties and the common creditor. The public powers and duties devolved upon the State by the statute can not be the subject of subrogation, because they are public, and because they are not susceptible of money valuation. The only property right secured to the State is the right to "payment of said bonds by said company, with the interest thereon;" and this right is secured directly to the bondholder, and is not to be worked out through the surety.—*McMullen v. Neal*, 60 Ala. 555. To make the test of priority the right of the holder to sue and recover on the indorsement, is a fallacy in argument, and is impossible of execution. The conditions annexed by the statute, to the indorsement of the bonds, do not go to the validity of the statutory mortgage: the statutory lien is complete and perfect in itself, as against the company and all its property, without reference to those conditions, as any other lien created or defined by statute. And that test would be impracticable and impossible, since the State can not be sued; nor would it be bound by any adjudication to which it was not a party.

[Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.]

The bonds were all indorsed by the governor, in the name of the State. He was the officer appointed by law to determine whether the statute had been complied with, and he was clothed with *quasi*-judicial powers for that purpose. The evidence upon which he was to act was prescribed, and his decision was final. His indorsement of the bonds was an adjudication of their validity, and of the existence of every fact essential to their validity; and it was intended to give the bonds full faith and credit in the markets of the world. There is no intimation in the statute that the indorsement would be vitiated by any fraud in obtaining it, or by any subsequent wrongful use of the bonds. On the contrary, the State relied for its protection on the safeguards provided by the statute.—*Plock & Co. v. Cobb*, 64 Ala. 127; *Nat. Bank v. Matthews*, 8 Otto, 621.

In the case of *Colt v. Barnes*, 64 Ala. 108, the court held that indorsed bonds were entitled to preference and priority over unindorsed bonds; and though the doctrine of subrogation was discussed, the real basis of the decision, it is submitted, must rest on the ground, that both the statute and the mortgage provided for such priority. But no such question can arise here, where all the bonds are indorsed, and no claim is preferred on account of any unindorsed bonds. The later case of *Forrest v. Luddington*, 68 Ala. 1, fully recognizes and affirms the principles herein contended for.

(*b*) *As to the claim of purchaser for value without notice.* If the suit were against the State, like any other accommodation indorser of negotiable paper, the *onus* would be on the defendant to prove notice of irregularity, or the like. But here, all the bonds being issued, indorsed, and received for value, all the holders stand on an equality; and when any one seeks to establish for his bonds a different and better *status*, he must allege and prove, according to the general rules of law, the facts necessary to make good his claim. He must deny notice, positively and particularly, and not generally or evasively; and where there are circumstances tending to show notice, the law "exacts the clearest and most explicit denial of notice."—*Ledbetter v. Walker*, 31 Ala. 179; *Wells v. Morrow*, 38 Ala. 128; *Moore v. Clay*, 6 Ala. 751. If the pleading falls short of this rule, relief will not be granted, no matter how full and satisfactory the proof may be.—Same authorities. If the pleading be sufficient, the *onus* is on the holder to show, by satisfactory evidence, that he acquired the bonds "for valuable consideration, before maturity, in the usual course of trade, and without notice of any defect or infirmity in the title."—*Reid v. Bank of Mobile*, 70 Ala. 199; *Mayor v. Plank-Road Co.*, 63 Ala. 632. The rule as to notice is, that whatever is sufficient to put a prudent man on inquiry, is sufficient to charge a party with

[Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.]

notice of every fact which inquiry would have developed. *Foster v. Stallworth*, 62 Ala. 549; *Wilson v. Wall*, 34 Ala. 303. The claim of Gilman, Sons & Co., tested by these rules, must fail on the pleadings, and equally on the proof.

*Their pleadings*, in their cross-bill and answer, set up their claim in these words: . "At the time of procuring said 58 bonds, respondents had no knowledge, information, belief, or suspicion, that there was any defense against said bonds, or any of them, or any doubt or question of their legality, validity, or binding obligation; and respondents aver that they purchased said bonds in good faith, and for the full par value, without any knowledge or notice of any of the facts alleged in said original and amended bills against the same." In assailing the other bonds, their language is: "None of said bonds numbered from one (1) to 262 were ever issued or negotiated by the said New Orleans and Selma Railroad Company and Immigration Association; and none of them have ever passed into the hands of *bona fide* holders for value, without notice that the same had not been negotiated by the said corporation; and none of them are secured by, or entitled to, the precedence and priority of lien given by the said act of the General Assembly; and if any of them are protected and secured in any manner by said deed of trust, their lien is subordinate to the lien of the bonds purchased and now held by these respondents." These allegations are the mere statement of legal conclusions, and are insufficient.— *Willingham v. Harrell*, 36 Ala. 580; *Duckworth v. Duckworth*, 35 Ala. 70; *Flewellyn v. Crane*, 58 Ala. 628; and authorities above cited.

*Their evidence* is fatally defective, and the weight of proof is against them. Only three of the partners are examined as witnesses, and their denial of notice, however full, would not negative notice to the fourth partner. As against the estate of Crawford, from whom they purchased, their evidence was incompetent, and was objected to on that ground.—*Stuckey v. Bellah*, 41 Ala. 700; *McCrary v. Rash's Adm'r*, 60 Ala. 374. An examination of their answers, too, will show such indefiniteness and evasiveness, as manifests an effort "to manufacture the defense of innocent purchaser out of facts not quite sufficient to authorize it" (*Ledbetter v. Walker*, 31 Ala. 179), and amounts to an implied admission of the fact not directly denied. As where W. S. Gilman is asked, "State when you, or, so far as you know, said firm, first heard that said bonds had been issued in consideration of money or materials used in the construction of the first twenty miles of said road;" his answer is, "I never had any *information regarding the construction* of the road, except what appears on the face of the bonds, until the receipt of a letter from C. M. Shelley, dated 10th September, 1875."

Against their indefinite denials is the positive testimony of John Tucker, who knew all the facts, and who testifies that his interview with them was had for the purpose of informing them of the facts, and that he did impart to them all the facts. Eight months elapsed from the time the contract was entered into, before the bonds were actually delivered, although it was stipulated that they were "to be delivered in about sixty days." The delay would naturally cause inquiry, and inquiry would have developed the fact that the first twenty miles of the road were not completed; and they are charged with implied notice of that fact when they bargained for the bonds.    Aside from the question of notice, the proof is that they purchased the bonds at the rate of 85 cents on the dollar, while the statute prohibited their sale or use at less than 90 cents; and paid for them in railroad scrip, which was at the time worth only five or ten cents on the dollar, and which shortly afterwards proved wholly worthless. These are not the *indicia* of an ordinary commercial transaction, and do not support the claim of a purchase for value in the usual course of business.

BRICKELL, C. J.—1.    The original bill was filed by a judgment-creditor of the "Selma and New Orleans Railroad Company and Immigration Association," who had exhausted his remedies at law; and its main purpose was to remove, as an obstacle in the way of obtaining satisfaction of his judgment, a mortgage, or deed of trust upon the property of the company, given to secure bonds it had issued.    The appellants, as holders of a number of these bonds, were made parties defendant; and they appeared and answered, affirming the validity of the bonds, and of the mortgage given as security for the payment; and also asserting that, as *bona fide* holders of the bonds, they were entitled to be subrogated to the paramount lien of the State as indorser, recognized in the mortgage.    The dismissal of the original bill, if erroneous, can not in any event operate prejudicially to the appellants, and of it they can not be heard to complain.    It is only matters which are of injury to the parties appealing, that will be noticed on error.

2–3.    In the absence of statutory provisions, a cross-bill and an answer are essentially separate and distinct pleadings; and it is irregular to join and blend them,—as irregular as it would be to join and blend an amended and supplemental bill.    Generally, a cross-bill is a mere mode of defense; and if all its purposes can be obtained by answer, the bill will not be entertained. There are some defenses which, however, can not be made by answer; and often, in aid of the defense, a discovery from the plaintiff in the original bill is necessary.    And as a general rule, by answer the defendant can pray only to be dismissed; if he

is entitled to relief touching the matter of the suit, he can obtain it, in the pending suit, only by cross-bill.—*Cullum v. Erwin*, 4 Ala. 452; *Goodwin v. McGehee*, 15 Ala. 232. Frequently, co-defendants have, as between themselves, opposite and clashing interests touching the matter of suit; without an adjustment of which, a complete decree, quieting the litigation, can not be rendered. In such case, either defendant may file a cross-bill; or the court may order it to be filed, bringing before the court the whole matter of litigation, and enabling it by one decree to settle the rights and interests of all parties,—*Cullum v. Erwin, supra;* Story's Eq. Pl. § 392; 2 Dan. Ch. Pr. 1548.

It is a cross-bill of this latter character which was incorporated in the answer of the appellants originally; a bill not seeking any discovery from the complainant in the original suit, or any relief against him, but seeking relief only as against the railroad company, and the other holders of its bonds, and the establishment and enforcement of the prior right of the appellants to the payment of the bonds held by them. According to the rules of pleading and practice prevailing in courts of equity, unchanged by statute, there can be no doubt that the appellants were without right to make an answer serve the purposes of a cross-bill. The court and the parties could have silently disregarded so much of the answer as purported to be a cross-bill; the failure of any party defendant to appear and plead to it, would not have authorized a decree *pro confesso* against him; or, on motion or exception, it would have been stricken out as impertinent; and the appellants, whatever may have been their right to file a cross-bill, or however necessary such a bill may have been for their protection, would have been in court in no other condition than as respondents who had only answered.

The statute provides, that a defendant may obtain relief against the complainant, for any cause connected with, or growing out of the subject-matter of the bill, by alleging in his answer, and as a part thereof, the facts upon which such relief is prayed, and that the complainant shall answer the same. The matter thus put in issue "must be considered in the nature of a cross-bill, and be heard at the same time as the original bill." Code of 1876, §§ 3801–04. It is apparent the statute refers to but one of the several kinds of cross-bill,—that in which relief is sought only against the complainant in the original bill; and has no reference or application to the other distinct and different kind of cross-bill, in which no relief is sought against him, to which he is a party rather for the sake of conforming the pleadings to the cause to which they belong, and affecting him by any order which may be rendered, staying, if necessary, a hearing on the original bill until the cross-bill is ripe for hearing

with it; and in which relief is sought only against co-defend-
ants. After demurrer upon this ground, to so much of the an-
swer as purported to be a cross-bill, the appellants amended, by
striking out the answer, and filing it as a separate pleading.
But, before the amendment, the co-defendants, Morton, Bliss
and others, had filed a cross-bill bringing the whole matter of
litigation before the court, and under which the appellants
could obtain full relief. In this condition of the cause, the
cross-bill of appellants was properly dismissed. A cross-bill is
not entertained, when in the original suit the party filing it can
obtain the full relief to which he is entitled. It is unnecessary,
adds to the costs, and tends to confusion; and without the re-
striction, cross-bills would be multiplied at the mere election of
defendants.— *Weed v. Small*, 3 Sand. Ch. 273; *Braman v.
Wilkerson*, 3 Barb. (S. C.) 151; *Bogle v. Bogle*, 3 Allen, 158.

4. The more important question the case involves is, whether
the appellants are entitled to subrogation to the statutory lien
of the State, as indorser of the bonds of the railroad company.
In the consideration of this question, we do not find it neces-
sary to pass upon the numerous exceptions to evidence which
were sustained by the City Court. The material facts upon
which the right depends, if it exists, are shown satisfactorily by
the pleadings, and by evidence to which no exception was taken.
These facts are, that the company had contracted with DuPuy
for the construction of its road, and, while he was engaged in the
construction of the first twenty miles, issued to him its bonds,
three hundred and twenty in number, each for the payment of
one thousand dollars, payable to the holder thereof, at the agency
of the corporation in the city of New York, bearing interest at
the rate of eight per-cent., payable semi-annually; the bond re-
citing on its face, that it was one of a series limited to sixteen
thousand dollars per mile of equipped and completed railroad
in the State of Alabama; and further, that it was "secured by a
mortgage, bearing even date herewith, of the railroad, with its
equipments, and appurtenances, and franchises of said corpora-
tion which relate thereto, issued under the provisions of an act
of the General Assembly of Alabama, entitled 'An act to fur-
nish the aid and credit of the State of Alabama, for the pur-
pose of expediting the construction of railroads,' approved Feb-
ruary 21st, 1870; all secured by a first lien, provided for in said
act, on the railroad of said company and its equipments, and all
other property relating thereto, including the franchises of the
company, with power of sale in case of default, and by indorse-
ment by the State of Alabama, made under authority and in
pursuance of the act of the General Assembly aforesaid." Hav-
ing completed and equipped the first twenty miles of road, the
bonds were returned to the company, that the indorsement

thereof by the State should be obtained; and the preliminary proofs required by the statute having been made, the Governor, in the name of the State, indorsed them. The bonds were then re-delivered to DuPuy, who applied them to pay the debt the company had incurred with him for the construction and equipment of the first twenty miles of the road; and he passed them to David Crawford, to whom he had become indebted for money borrowed, and to Morton, Bliss & Co., to whom he had become indebted for railroad iron, while engaged in such construction, they having notice of the application DuPuy had made and was making of the bonds. Fifty-eight of these bonds Crawford subsequently transferred to the appellants, under circumstances, and upon a consideration which will be hereafter noticed.

The real relation of the State was that of an accommodation indorser of the bonds of the company. For the indorsement there was no consideration of value moving to the State, and its only purpose was giving credit and currency to the circulation of the bonds. In the words of the title of the statute which authorized the indorsement, the purpose was, " to furnish the aid and credit of the State to expedite the construction of railroads." Until twenty continuous miles of road had been completed and equipped, the indorsement of bonds by the State was unauthorized; and the completion and equipment must have been from resources of the company, distinct and independent of such as were or could be derived from a negotiation of the bonds indorsed by the State. The plain purpose of the statute was, that the indorsed bonds should be applied to no other uses or purposes, than to the further construction and equipment of the road. The indorsement was of no force—as a contract, it had no legal inception—until the bonds were by the company negotiated. The bonds referring to the statute under which they were indorsed, every person dealing in them was put on inquiry, and at his own peril was bound to take notice of its requirements, of the relation of the State as indorser, and of the uses or purposes for which the company could legally and properly transfer them.—Jones on R. R. Securities, sections 226, 297, 27; *N. O., M. & C. R. R. Co. v. Dunn*, 51 Ala. 128; *McLure v. Township of Oxford*, 94 U. S. 429.

5. The application of the bonds by DuPuy to pay the debt the company had contracted with him for the completion and equipment of the first twenty miles of the road, was in direct contravention of the statute—was a diversion of the bonds from the uses and purposes to which they were by the statute appropriated, and to which the company, by the very act of procuring and accepting the indorsement, agreed they should be solely and exclusively appropriated. Whether the company assented

[Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.]

to the application, or whether they re-delivered the bonds to DuPuy, upon his promise to continue the construction and equipment of the road, and to use the bonds to raise money for that purpose, is not material. With full knowledge of the only uses and purposes to which they could be appropriated, he applied them to the payment of the existing debt of the company, in contravention of the statute, and in violation of the agreement of the company under which the credit of the State was loaned; and thereafter he abandoned his contract to construct further the road. Whoever takes accommodation paper, with knowledge that the terms and conditions upon which the accommodation was given are being violated; whoever participates in the diversion of the paper to other objects or uses than such as were intended when the paper was made, unless fraud is imputed, must be understood to relieve the party giving the accommodation from all liability, whatever liability the party with whom he deals may incur.—2 Parsons Notes and Bills, 27; 1 Dan. Neg. Inst. 594.

It was the interest of the State that the further construction of the road should be continued—to expedite the construction the bonds were indorsed. There was no general lending of its credit by the State, but a loan upon terms and conditions; and a diversion of the bonds from the uses to which it was designed they should be applied, and their application to uses prohibited by the statute, would be a fraud, if the parties intended to assert its liability. As between DuPuy and the State, the indorsement had no binding force; as a contract, it had not legal inception. Crawford, and Morton, Bliss & Co., acquiring the bonds from DuPuy, with knowledge that he had applied them in payment of a pre-existing debt of the company, in violation of the statute, and in violation of the terms and conditions upon which the indorsement of the State was made, chose to receive them with all the infirmities to which they were subject in DuPuy's hands—they were substituted to his place, acquiring only his rights.

6. The bonds were negotiable instruments; the purpose of making or issuing, as well as of indorsing them, was, that they should be employed in raising money by sale, or otherwise, in the usual course of business; that they should be employed for all the purposes for which bank-notes could be employed. The principles of the law-merchant, founded upon considerations of public policy and the necessities of commerce, "so well and so long established, that it is laid up among the fundamentals of the law, and neither reasons nor authorities are now necessary to be brought forward in its support," affirms the right and the title of a *bona fide* holder, for value, of negotiable paper, acquired before maturity, whatever may be the defenses or equi-

ties existing as against antecedent parties.—*Swift v. Tyson*, 16 Peters, 1; *Goodman v. Simonds*, 20 IIow. 343; *Murray v. Lardner*, 2 Wall. 110. The State, though there had been an appropriation of the bonds to uses which were excluded by the terms and conditions upon which its indorsement was lent to the railroad company, and as to the State the bonds can be said properly to have been put in circulation fraudulently, would become liable to a *bona fide* holder, taking them without knowledge of the misappropriation, or of the fraud.—Jones on Railroad Securities, section 284; *State, ex rel. Plock v Cobb*, 64 Ala. 127.

7. Whether the appellants stand in this relation—whether they acquired the bonds for value, without knowledge of the infirmity of the indorsement of the State, and of the title of Crawford, is a material point of contention. The question must be considered and determined, as it would be if the State were a party, and the immediate object of the suit was the enforcement of the indorsement. The fact being shown that there had been an appropriation of the bonds to uses which were excluded by the terms and conditions of the indorsement; and as to the State, if the purpose was not to relieve and release it from liability, the bonds were put in circulation fraudulently; upon the holder, pursuing the State, the law casts the burden of proving that he acquired them for value, in good faith, and in the usual course of business.— *Wallace v. Br. Bank Mobile*, 1 Ala. 565; *Thompson v. Armstrong*, 7 Ala 256; *Ross v. Drinkard*, 35 Ala. 434. The right of the antecedent holder to assert the liability of the State is destroyed, or, rather, is shown never to have existed; and the right of subsequent holders, resting only on a title derived from him, which has not some other foundation, can not rise superior to it. A higher and better right, resting upon its own foundation, is shown, when it appears that in good faith, upon a consideration of value, in the ordinary or usual course of business, the bonds were acquired.

8. If the appellants are holders for value, there can be no question the bonds were taken according to the customs and usages of mercantile transactions. The sale or exchange of such securities for shares of stock in railroad corporations, or for the shares of the stock of companies organized either as joint-stock companies, or as corporations, for the construction of railroads by contract, is, doubtless, an ordinary commercial transaction. The controversy seems to be directed specially to the *sufficiency of the consideration* with which the appellants parted, and whether there were no circumstances attending the transaction which ought to have excited inquiry into the nature of Crawford's title, and the manner in which he had obtained the bonds. The facts are, that on 17th October, 1870, appellants sold to Crawford shares of stock in the Des Moines Valley Construction Com-

pany, of the nominal value of three hundred thousand dollars; Crawford agreeing to deliver, within about sixty days, the bonds of the Selma and New Orleans Railroad Company, &c., guaranteed by the State of Alabama, bearing eight per-cent. interest, for fifty-eight thousand dollars, the interest to begin on the first day of January, 1871. The stock was greatly depreciated, not having probably a marketable value exceeding ten cents to the dollar of its nominal value. Of the company, Crawford was treasurer, and a large stockholder. The bonds were not indorsed by the State until 14th July, 1871, and were not delivered to the appellants until the 22d of that month. It is apparent the bonds were estimated by the parties as of their face value; for delay having occurred in their delivery, the interest during the period of delay they would have borne, Crawford paid to the appellants in money. Not long afterwards, the Des Moines stock became valueless in consequence of the failure of the company. There is not in the transaction any fact indicating that the parties regarded the bonds of doubtful, or of uncertain value, however they may have regarded the stock with which they were purchased.

It is only a purchaser or holder *for value*, not a mere volunteer, the law protects against equities and defenses to which negotiable paper would be subject in the hands of antecedent holders. The books employ various expressions; sometimes it is said *full value* must have been parted with; sometimes *fair and reasonable value;* but most often, perhaps, the single word *value* is employed. The principle is analogous, in many respects, to that which prevails in courts of equity for the protection of *bona fide* purchasers against equities affecting the legal estate, of which they have not notice.—2 Lead. Eq. Cases, 103. Generally, it is agreed, that it is not necessary to constitute a *bona fide* purchaser of the legal estate, or a *bona fide* holder of negotiable paper, that he should have parted with money, or money's worth. If he parts with, or cedes an existing right, or if he forbears, or suspends legal remedies, there is, in the legal sense of the term, a valuable consideration.—1 Amer. Lead. Cases, 226; 2 Lead. Eq. Cases, 103. In considering this question, it is said in *Goodman v. Simonds*, 20 How. 371: "The better opinion seems to be, in respect to parol contracts, as a general rule, that there is but one measure of the sufficiency of a consideration; and, consequently, whatever would have given validity to the bill as between the original parties, is sufficient to uphold a transfer," &c. There would be much of difficulty and uncertainty in the application of any other principle. It can not be supposed, that only the party giving in money the full face-value of negotiable paper, or its equivalent in property, is a *bona fide* holder for value. Whenever, from any cause—de-

pression of the money market, or depression in the affairs of the State, or of corporations—there was depreciation in the value of such securities as were the subject of this transaction, such a rule would stop their circulation, and divest them of the legal incidents of negotiability. If it be said, there must be a fair and reasonable consideration, the inquiry at once arises, what is to be deemed such a consideration; an inquiry it would be as difficult to determine, as it would be to determine the inadequacy of consideration which would justify the rescission of a contract. The safer doctrine, it seems to us, is, that when the holder, as in the present case, parts with value, no question of usury being involved, the amount of the consideration is material in no other respect than as it may bear upon the inquiry, whether he had notice, actual or constructive, of the infirmity of the paper, or of the title to it.—*Gould v. Segee,* 5 Duer, 260.; *Phelan v. Moss,* 67 Penn. St. 59.

There is no reason for supposing that Crawford purchased the stock with a view to its immediate conversion into money at its market value. The relation he sustained to the company would rather indicate that he regarded it as of greater value. But it is not necessary to speculate upon the reasons which may have induced him into the transaction; there can be no doubt, if he had given for the stock his own negotiable paper of the precise amount of the bonds, that it would have been supported by a sufficient consideration. The appellants parted with the stock, and he acquired it, in the usual course of business; and the relation of the appellants is that of holders of the bonds for value.

9. The appellants, having acquired the bonds for value, in the usual course of business, can not be affected by the fraud and illegality of DuPuy's appropriation, and Crawford's acquisition of them, unless notice of it can be traced to them. The presumption is of a want of notice; for, "though possible, it is not likely, that notice of the original fraud or illegality would be communicated to subsequent holders." It is not incumbent upon them to prove the absence of notice; but it is incumbent on the party assailing the presumption, and questioning their title, to prove it. —Byles on Bills (6th Amer. Ed.), 194; *Carpenter v. Longan,* 16 Wall. 271. There is no evidence of direct notice. The evidence of Tucker, as to the interviews he had with one or more of the appellants, at the instance of Crawford, is too vague and indefinite to justify the inference that he communicated the fact that Crawford had, or would acquire the bonds from DuPuy, in violation of the terms and conditions upon which the indorsement of the State was loaned, thereby relieving the State from liability. It was for bonds guaranteed by the State, the appellants contracted, and Crawford promised

to deliver. The guaranty or indorsement of the State became worthless to them, if, at the time of the contract, they were informed of DuPuy's misappropriation; and it was idle for them to contract for bonds of that description. ' And it is scarcely possible that Crawford; who brought about the interview for the purpose of inducing the appellants into the transaction, would have invited a disclosure of the infirmity of his title as against the State. All that can be said of Tucker's evidence is, that at Crawford's instance he communicated to one or more of the appellants the number of miles of road the railroad company had constructed, and that the bonds were the first-mortgage bonds of the company. If any other particular facts were communicated, he does not disclose them.

In reference to the facts which it is supposed ought to have put the appellants upon inquiry as to the manner of Crawford's acquisition of the bonds, it is enough to say, that the largest significance claimed for them is, that they might have aroused suspicion as to his title. It is not, under the prevailing principles of the commercial law, enough to defeat the title of the holder of negotiable paper, to show that he acquired it under circumstances which would, in the mind of a prudent man, have excited suspicion as to the title of the party from whom he derived it.—*Goodman v. Simonds, supra; Murray v. Lardner, supra; Phelan v. Moss, supra.* It is apparent from the contract, that it was expected Crawford would thereafter acquire the bonds; hence, a future day is appointed for the delivery; and the fact is apparent that he did not obtain them, bearing the indorsement of the State, until a short time before their delivery. These facts may have excited the belief, that when he made the contract with the appellants, he had some arrangement by which he would obtain the bonds. But, would they probably divert and direct inquiry to the nature of that arrangement? Would they excite the suspicion of the most prudent, dealing in negotiable securities, that he intended acquiring them, or had acquired them, fraudulently, or illegally? We can not think the facts are sufficient to cast a shade on the transaction, so far as the appellants are concerned. It is only bad faith which will defeat their right to enforce the bonds against all parties to them.

10. The remaining question has been heretofore considered and decided by this court. The statute gave the State, for its protection and indemnity, a lien upon the property of the railroad company, having precedence and priority over all other liens, by way of mortgage or otherwise. The holders of the bonds of the company, indorsed by the State, to whom the State is liable upon its indorsement, upon default in the payment of the bonds, are entitled to be subrogated to the lien of

[Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.]

the State. The subrogation is just and equitable, and is essential to render effectual the purposes of the statute in the creation of the lien—the protection and indemnity of the State. *Colt v. Barnes*, 64 Ala. 108; *Forrest v. Luddington*, 68 Ala. 1. The equity is worked out through and from the liability of the State; and if the liability does not exist, the equity does not arise.—*Bankhead v. Owen*, 60 Ala. 457; *Houston v. Br. Bank Huntsville*, 25 Ala. 250; *Grigsby v. Hair*, Ib. 327. And of consequence, it can not be claimed by a party who, in his transactions with the railroad company, has relieved the State from liability, though he may be entitled to enforce the subordinate mortgage the company may have executed.

There would be the difficulties attending the subrogation, suggested in the arguments of counsel, and pointed out by Mr. Justice BRADLEY, in *Branch v. Macon & Brunswick R. R. Co.*, 2 Woods, C. C. 385, if the State was pursuing the remedies given to it specially, and had possession of the property of the company. If a court were then to intervene—to intercept the remedies of the State, and to interrupt its possession—as it could intervene only at the instance of a party to whom the State was liable, or a party having a superior equity, there would be embarrassments arising from the incapacity of the State to be sued, and from other considerations, which this case does not involve. The constitution forbids the making of the State a party to suits in law or equity. It would be a harsh construction of the constitution, leading to the most inequitable consequences, that circumscribed the jurisdiction of the courts to determine controversies between individuals claiming rights, or asserting defenses, which must be traced to, or derived from the State. The incapacity of the State to be sued, as a general rule, is a sufficient reason for dispensing with its presence as a party.—*Davis v. Gray*, 16 Wall. 220; *Arlington case*, 3 Hughes (C. C.) 1; *Hagan v. Walker*, 14 How. 29.

The result is, that the City Court erred, in not decreeing the appellants were entitled to subrogation to the lien of the State, and, of consequence, to precedence and priority over the other holders of the bonds of the railroad company, who are entitled only to the security of the mortgage. The decree in this respect will be here reversed, reformed and corrected; otherwise affirmed, and remanded to the City Court for execution.

NOTE BY REPORTER.—On application for rehearing, by the counsel for Morton, Bliss *et al.*, the judgment rendered in this case, as indicated above, was set aside, and judgment rendered as follows: "It is considered that the decree of said City Court be reversed and annulled, and the cause be remanded to said

City Court for further proceedings; and that the appellees pay the costs of this appeal, both in this court, and in said City Court."