# Morton & Bliss *v.* New Orleans & Selma Railway Company and Immigration Association.

*Bill in Equity by Judgment Creditor of Insolvent Railroad Corporation; Cross-Bill between Holders of State-Indorsed Bonds.*

1. *Amendment by adding or striking out parties, under statutory provision.*—The statute authorizing amendments in chancery, at any time before final decree, "by striking out or adding new parties" (Code, § 3790), is very liberal in its provisions, and confers a right which, in a proper case, is not matter of discretion with the chancellor; but it is not

[Morton & Bliss v. N. O. & Selma Railway Co.]

to be construed as authorizing, in every case, as matter of right, the introduction by amendment of new parties who, by purchase or voluntary assignment *pendente lite,* have acquired an interest in the subject-matter of the suit.

2. *Purchase pendente lite; substitution of trustee.*—A purchaser of property *pendente lite* takes it subject to the hazards of the pending litigation, and is bound by any decree afterwards rendered; and this rule applies with special force where a new trustee is substituted by the voluntary act of the parties, without the sanction of the court, pending a suit to enforce the trust.

.3. *Judgment creditor of insolvent corporation; may come into equity, when.*—A judgment creditor of an insolvent corporation, having an execution returned no property found, may file a bill in equity to reach and subject equitable assets, to remove incumbrances which prevent the enforcement of his judgment at law, and to determine the validity of liens on the property asserted under the incumbrance.

4. *Same; cross-bill between bondholders.*—The original bill being filed by a judgment creditor of an insolvent railroad corporation, which had conveyed all of its property to trustees for the benefit of the holders of certain mortgage bonds, the validity of which was assailed and denied by the complainant; a cross-bill between the several bondholders, claiming and asserting antagonistic interests under the deed of trust, is proper and necessary to adjust and settle their conflicting liens and priorities.

5. *State-indorsed railroad bonds, misapplied by railroad corporation; rights of holders.*—As held in this case on the former appeal (72 Ala. 566), the State-indorsed bonds of the New Orleans and Selma Railroad Company, issued to the company on the completion of the first twenty miles of its road, having been misapplied by it, in violation of the terms of the statute under which they were indorsed (Sess. Acts 1869-70, pp. 149–57), in payment of their debt to the contractor for work done in building said first twenty miles, the indorsement created no liability against the State, while the bonds remained in the hands of the contractor, or of any other person who was chargeable with notice of such misapplication; but, said bonds being negotiable instruments, and governed by the rules applicable to other negotiable paper, the State is liable, as an accommodation indorser, to any *bona fide* holder who acquired the bonds for value, in the usual course of business, without knowledge or notice, actual or constructive, of their original misapplication.

6. *Same; who are purchasers for value, without notice.*—As to the bonds held by Gilman, Sons & Co. (58, of the 320 issued to the railroad company), and purchased by them from Crawford, to whom they were transferred by the contractor, the court holds, as on the former appeal (72 Ala. 566), that they are *bona fide* holders for value, without notice of the misapplication, although they bought the bonds, at par, in exchange for the bonds of a private construction company which were worth only about ten cents on the dollar; but, as to the bonds held by Morton, Bliss & Co., which were transferred to them by the contractor, in payment for the iron sold by them to him (and used by him in the construction and equipment of said first twenty miles of road), that they are chargeable with notice of the misapplication, and can not be deemed innocent purchasers.

7. *Same; right of holders under deed of trust.*—Of the holders of the 320 indorsed bonds issued by said railroad company, only those who are purchasers for value without notice are entitled to be subrogated to the statutory lien and priority of the State; but, as against the railroad company, which has waived the defense of a partial failure of consideration, and as against the complainant in the original bill, a subsequent judgment creditor of the railroad company, all are entitled to share in

[Morton & Bliss v. N. O. & Selma Railway Co.]

the security afforded by the deed of trust, and to have it enforced for their benefit.

8. *Creditors' bill to foreclose deed of trust ; parties coming in under decretal order of reference.*—By the settled practice of courts of equity, under a bill to enforce and forceclose a deed of trust for the benefit of numerous creditors, the court may adjust equities and priorities of the different classes of creditors, as represented by the parties then before the court; and those who afterwards come in under the decree and order of reference, and prove their claims, can not complain that this was done before they were in court as parties.

9. *Negotiable bonds, with attached coupons due and unpaid ; purchase in good faith, without notice.*—Negotiable bonds not due, with attached coupons past-due and unpaid, do not thereby appear dishonored on their face; but the presence of such unpaid coupons is a material circumstance bearing on the question whether the purchaser acquired them in good faith, and without notice.

10. *Commercial paper ; when purchaser is entitled to protection.*—Mere suspicion on the part of a purchaser of negotiable paper, of a defect in the seller's title, or knowledge of facts which would excite suspicion in the mind of a prudent man, is not sufficient to vitiate or impair his title ; there must be bad faith, or something equivalent to it; and while gross negligence is not, of itself, bad faith, it may be evidence of it.

11. *Same ; constructive notice ; burden of proof.*—The bonds in this case referring on their face to the deed of trust executed by the railroad company for their security, which deed expressly provided that the entire debt, principal and interest, should become due and payable within ninety days after refusal to pay the semi-annual interest due by the coupons, on demand made at the agency of the corporation in the city of New York; a purchaser having knowledge of such demand and refusal, at the time he acquired the bonds, can not claim to be an innocent purchaser without notice; but, when he has proved the payment of value, the *onus* of proving knowledge or notice of such extrinsic fact is on the party who seeks to impeach his title.

12. *Same ; constructive notice by public statute.*—The statute approved February 21st, 1870, under which these railroads bonds were indorsed and provision made for their payment, and the repealing statute approved March 17, 1875, being public statutes, every purchaser and holder of the bonds is chargeable with knowledge of their provisions; and although the repealing statute may not amount to any open repudiation by the State of its liability as indorser (a point not decided), "it is sufficient to put a subsequent purchaser on inquiry, and to charge him with notice of the fact that there was something wrong about the bonds, especially when taken in connection with the other fact that, at the time of such repeal, the coupons for several years past-due and unpaid were attached to them."

[On rehearing, and petition for allowance of counsel fees.]

1. *Transfer of negotiable paper as collateral security.*—When negotiable coupon bonds, or other commercial instruments, are transferred as collateral security, for the repayment of money advanced on the faith of them, the holder should be permitted, on foreclosure of a deed of trust given to secure them and other bonds issued at the same time, to prove for the entire amount of the collaterals so held by him ; but he can only recover the amount of his original debt, with lawful interest thereon.

2. *Same ; allowance of counsel fees.*—Counsel fees incurred by the holder of bonds so transferred, in the suit to foreclose the deed of trust, not being a part of the debt for which the bonds were transferred as collateral security, can not be allowed as part of the amount for which they are entitled to prove, over and above the amount of their debt.

3. *Allowance of counsel fees out of funds in court.*—When a trust fund

[Morton & Bliss v. N. O. & Selma Railway Co.]

is brought into court, under a bill necessarily filed by a trustee to preserve the estate from waste or destruction, he is entitled to an allowance for reasonable counsel fees, as part of the necessary expenses of the suit; and when a creditor files a bill in equity, for the joint benefit of himself and other creditors, counsel fees are properly charged on the common fund brought into court, or apportioned among the several creditors who claim the benefit of the decree. But the principle can not be extended to a bill filed by a judgment creditor of an insolvent railroad corporation, seeking to set aside an assignment of its property by deed of trust for the benefit of certain bondholders, which deed is held valid, the bondholders allowed to come in and prove their claims, their equities and priorities adjusted, and the deed enforced and foreclosed for their benefit; though, after satisfaction of the claims adjudged to constitute a first lien on the property, the attorneys of creditors holding a second lien, who filed the cross-bill for the enforcement and foreclosure of the deed, may ask an allowance for reasonable fees out of the residue of the fund distributable among creditors holding a second lien.

4. *Distribution of fund among creditors; equitable rule distinguished from legal.*—In a court of equity, where equality as regarded as equity, the principle which prevails at law, as to the distribution of money among execution creditors, is not applied; but the money arising from the sale of property, under a decree foreclosing a deed of trust executed by a railroad company for the security of its bondholders, is distributed *pro rata* among the bondholders entitled to a first lien, and the residue among the bondholders entitled to a second lien, without regard to the time at which their several liens accrued.

APPEAL from the City Court of Selma, sitting in Equity.

Heard before the Hon. W. C. WARD, as special chancellor, selected by the parties on account of the disqualification of Hon. JONA. HARALSON, the presiding judge of the court.

The original bill in this case was filed on the 10th October, 1877, by Richard M. Robertson, a judgment creditor of the New Orleans and Selma Railroad Company and Immigration Association, a private domestic corporation, which was alleged to be insolvent; against the said corporation, and against T. H. DuPuy and others, who were alleged to be in possession of the property of said corporation; and against Gilman, Sons & Co., a firm doing business in the city of New York, as the claimants or holders of certain mortgage bonds which had been issued by said corporation; and against the Union Trust Company, a foreign corporation, organized and doing business in the city of New York, as the trustee in said mortgage. An amended bill was afterwards filed, bringing in as defendants the several persons composing the firm of Morton, Bliss & Co., a partnership doing business in the city of New York, and L. M. Barlow as the personal representative of the estate of David Crawford, deceased, alleged to be holders and claimants of other mortgage bonds of said insolvent corporation. The complainant obtained a judgment for $45,000 against said corporation, in the Circuit Court of Dallas county, in January, 1874; but this judgment was set aside, on a subsequent day of the term,

38

another judgment for $12,176 rendered, and the case continued for further contest as to the residue of the claim; and in June, 1876, the contest resulted in another judgment in his favor, for $17,478.20. Executions on each of these judgments were regularly issued, and returned "No property found," before the bill was filed. The object and prayer of the bill was to set aside the mortgage, as an incumbrance on the property of the corporation, which would prevent it from bringing an adequate price at a sale under execution at law; or to have the mortgage bonds, if any of them were lawful and valid claims against the property, declared inferior to the lien of the complainant's judgments, and to have the property sold in satisfaction of his debt, and of other valid debts or claims which might be presented and proved.

The defendant railroad corporation was chartered by an act of the General Assembly of Alabama, approved February 23d, 1866, and was authorized to build a railroad between Selma and New Orleans; and its name was changed, by adding the words "*and Immigration Association*," by another act, approved December 22d, 1868. The corporation was regularly organized under its charter, the complainant being a large stockholder and its first president. The first twenty miles of the railroad, beginning at Selma, were built under contract with said T. H. DuPuy, entered into on the 22d February, 1870; by the terms of which contract he undertook to construct the entire road, at an agreed compensation per mile of $16,000 of the first-mortgage bonds of the corporation, indorsed by the State as ;then provided by law, and was to receive, in addition, certain cash subscriptions, shares of stock, &c. By the act of the General Assembly approved February 21st, 1870, it was provided that the bonds of a railroad company should not be indorsed by the State until twenty miles of its road were "completed, equipped and finished;" and that the bonds should then be indorsed for said twenty miles, to the amount of $16,000 per mile, and to the same amount for each additional section of five miles as completed.—Sess. Acts 1869–70, pp. 149–56. On the 16th May, 1870, the contract between said DuPuy and the corporation was modified, and it was stipulated that his compensation should be, for the first twenty miles, $16,000 per mile of the unindorsed bonds of the railroad company, in addition to certain subscriptions, shares of stock, &c.; and on the completion of the first twenty miles, as required by the said act of February 21st, 1870, the company agreed, "for the purpose of building and expediting the construction and equipment of the second section of twenty miles of said road, to advance and pay to the said party of the second part [DuPuy] $320,000 in the mortgage bonds of said com-

pany, indorsed by the State of Alabama," and at that rate for each continuous five miles.

On the 16th July, 1870, the railroad company executed to the Union Trust Company of New York, as trustee, a mortgage, or deed of trust, conveying its franchise, road and property, to secure bonds which it proposed to issue for the purpose of raising money, as recited in certain resolutions which were set out in full in the deed, " to enable this company to construct and equip its road beyond the first twenty miles, that much having been already provided for ; " the bonds to be in a prescribed form, for $1,000 each, payable on the 1st July, 1895, with interest at the rate of eight per cent. *per annum*, payable semi-annually, at the office or agency of the railroad company in the city of New York, " on presentation and surrender of the annexed coupons as they severally become due ; " each containing on its face the words, " *To be indorsed by the State of Alabama*," and a recital in these words : " This is one of a series of bonds, of like tenor, date and amount, numbered consecutively from one upwards, and limited to sixteen thousand dollars per mile of completed and equipped railroad in the State of Alabama ; secured by a mortgage, bearing even date herewith, of the railroad, with its equipments and appurtenances, and franchises of the said corporation which relate thereto ; issued under the provisions of an act of the General Assembly of Alabama, entitled ' An act to furnish the aid and credit of the State of Alabama for the purpose of expediting the construction of railroads,' approved February 21st, 1870 ; all secured by a first lien, provided for in said act, on the railroad of said company, its equipments, and all other property relating thereto, including the franchise of the company, with power of sale in case of default, and by indorsement of the State of Alabama, made under authority and in pursuance of the aforesaid act of the General Assembly." This mortgage contained a provision in these words : " If, at any time hereafter, the said party of the first part shall, after demand made, make default, refuse, neglect or omit, for any period exceeding ninety days, to pay the semi-annual interest on the bonds aforesaid, or any of them, then and in any such case the whole principal sum of each and all of the bonds intended to be hereby secured, together with all interest thereon, shall thereupon become forthwith due and payable."

Of the bonds provided for in this mortgage, 320 were issued, and were delivered to said DuPuy under his contract, but without the State's indorsement, before the completion of the first twenty miles of the road. In June, 1871, the first twenty miles having been completed, DuPuy re-delivered the bonds to the railroad company, in order that the State's indorsement

might be procured; and the indorsement having been made, on proof of full compliance with the requisitions of the statute, they were again delivered to said DuPuy. These bonds were transferred by DuPuy to David Crawford and the persons composing the firm of Morton, Bliss & Co. of New York, in payment of debts which he had contracted with them for iron and other materials purchased and used in the construction and equipment of said first twenty miles of the road. No other bonds were issued by the company, and no further portion of the road was built; and this suit, under the pleadings, was resolved into a contest among the several holders of these bonds, claiming as purchasers or sub-purchasers under DuPuy.

On the 6th April, 1878, Morton, Bliss *et al.*, having answered the original bill, filed a cross-bill, "on behalf of themselves and all other creditors of the New Orleans and Selma Railroad Company and Immigration Association, who shall come in and contribute to the expense of this suit;" claiming to be the holders of 150 of the said bonds, which, as they alleged, they purchased in good faith, for full value, before maturity, and without notice of any defect in, or defense against them; asserting the validity of said bonds, and their right to priority of lien as against other creditors or incumbrancers, under the mortgage, and under the statutory lien; alleging their presentation of the coupons for payment on the 1st July, 1872, which was refused, whereby the bonds became due and payable by the terms of the mortgage; and praying relief as follows: 1. "That the validity and order of priority of the several and respective liens and claims of the parties to this action, upon and against the said railroad and other mortgaged property and premises hereinbefore described, may be determined and decreed." (2.) "That it may be ascertained, determined and decreed, who are the *bona fide* holders and owners of the bonds hereinbefore referred to; which are outstanding, and to what extent; and for what sums the same are valid obligations, or are secured by the said deed of trust and statutory mortgage hereinbefore referred to, and what are the rights respectively of the owners of said bonds." (3.) "That the said railroad and all the property embraced in and described or referred to in said deed of trust, including right of way, property, franchises, capital stock," &c., "be sold in such manner as this court shall direct." (4.) "That an account be taken in respect to the money due upon said bonds secured by said deed of trust and statutory mortgage, for principal and interest; that the holders thereof be ascertained; that the proceeds of sale be applied, under the direction of the court, to the payment and discharge of the said several sums; and that this suit and the said original suit may constitute but one cause,

[Morton & Bliss v. N. O. & Selma Railway Co.]

and as such be heard together." (5.) "And that your orators may have such other and further relief in the premises as the nature of the case may require," &c.

Gilman, Sons & Co., who were the holders of 58 bonds, and who had answered the original bill, filed their answer to the cross-bill, claiming priority of lien, both under the mortgage and under the statute, against the original complainant, the complainants in the cross-bill, and all other creditors or claimants; and they demanded proof of all adversary claims.

On final hearing, on pleadings and proofs, the special chancellor dismissed the original bill, holding that the complainant showed no right to relief, either against DuPuy or against the bondholders; but he retained the cross-bill of Morton, Bliss *et al.*, and rendered a decree under it, declaring that the bondholders, though none of them were *bona fide* purchasers for value as against the State, were entitled to have the mortgage foreclosed by a sale of the property, and to share equally in the proceeds of the sale. On appeal to this court, by Gilman, Sons & Co., this decree was reversed, and the cause remanded; the court holding that they were entitled to precedence and priority over the other bondholders, and were entitled to be subrogated to the State's statutory lien, while the others were only entitled to the security of the mortgage. See the case reported in 72 Ala. 566–87, where the facts are stated as to the purchase of their bonds by said Gilman, Sons & Co.

Robertson, the complainant in the original bill, having died, the suit was revived in the name of A. V. Gardner, as his administrator. A decree *pro confesso* was taken against the Union Trust Company, who made no defense. Afterwards, by action on the part of a majority of the bondholders, said company was removed as trustee, and John Tucker was appointed trustee in its stead. Tucker took possession and control, as trustee, of the railroad and its property, and leased it, for a term of years, to the Selma and Greensboro Railroad Company, whose name was afterwards changed to the Cincinnati, Selma and Mobile Railroad Company. After the remandment of the cause on the reversal, the complainants in the cross-bill asked leave to amend their bill, by averring these facts, and making said Tucker and said railroad lessee parties defendant; and another proposed amendment, in addition to these new parties, made J. & W. Seligman & Co., of New York, defendants to the cross-bill, as the holders or claimants of some of the railroad bonds. The special chancellor denied and refused each of these amendments as proposed; but he allowed a third amendment, which varied the allegations of the bill as to the number of bonds held or claimed by different parties, and struck out the names of several persons who had disclaimed all interest in the suit.

The cause being again submitted for decree on pleadings and proof, the special chancellor held—1st, that the original bill was well filed, and the complainant therein was entitled to prove his claims, and to share in the proceeds of sale of the mortgaged property, after the claims of the bondholders were satisfied ; 2d, that the bondholders were entitled to a foreclosure of the mortgage, which was accordingly decreed ; 3d, that Gilman, Sons & Co., under the decision of this court, were entitled to be subrogated to the statutory lien of the State, and to have their bonds (58 in number) first paid out of the proceeds of sale of the mortgaged property ; 4th, that Morton, Bliss *et al.*, as the holders of 150 bonds, were not entitled to be subrogated to the statutory lien of the State, but were entitled to share in the proceeds of sale of the property, equally with other bondholders in like condition, after the claims of Gilman, Sons & Co., and also of other bondholders in like condition with them, who might prove their claims before the register, had been satisfied ; and he ordered a reference to the register, directing him to advertise for creditors to come in and prove their claims, to state an account of the several debts and claims, and to report the evidence adduced by each claimant.

On the reference before the register, other bondholders appeared and proved their claims, among whom were J. & W. Seligman & Co., as the holders of 47 bonds ; A. W. Jones, E. K. Carlisle, A. Fowlkes, and J. W. Crenshaw, as the holders of 50 bonds ; W. S. Nichols, as the holder of ten (10) bonds ; and Perkins, Livingston & Post, as the holders of two (2) bonds, thus leaving out only three bonds of the entire 320 issued. Numerous exceptions were reserved by the several parties, especially by Seligman & Co. and Morton, Bliss *et al.*, to the register's rulings on evidence, and to his allowance of different claims ; but none of these matters require any special notice. On the coming in of the register's report, some of the exceptions were sustained, and others overruled ; and the special chancellor rendered a final decree, declaring that the creditors above named, each and all, were *bona fide* owners and holders of their respective bonds, and were entitled, equally with Gilman, Sons & Co., to be subrogated to the statutory lien of the State, and to be first paid out of the proceeds of sale of the mortgaged property ; and he ordered the register to proceed with the execution of the decree of sale.

From this decree Morton, Bliss *et al.* appeal, and here make twenty-one assignments of error, and among them (1) the refusal to allow the proposed amendments ; (2) the ruling that John Tucker was not a proper and necessary party ; (3) holding the decision of this court conclusive as to the *status* of

[Morton & Bliss v. M. O. & Selma Railway Co.]

Gilman, Sons & Co., and of these appellants; (4) decreeing that these appellants were only entiled to a secondary lien, after the claims of Gilman, Sons & Co. and others are satisfied; (5) retaining the original bill, which assailed the validity of the deed of trust, and at the same time granting relief under the deed of trust, as valid.  Errors were also assigned by Seligman & Co., W. S. Nichols. and Perkins, Livingston & Post, assailing the correctness of the decree as to the claims of Gilman, Sons & Co., the rejection of the proposed amendments, and other matters; and by Robertson's administrator, complainant in the original suit, founded on that part of the decree which gave the bondholders a lien prior and superior to that of his judgments.  Gilman, Sons & Co., by consent, make a cross assignment of errors, as to that part of the decree which gave the several creditors above named an equal *status* with them in the right to be subrogated to the statutory lien of the State.

BROOKS & ROY, for Morton, Bliss *et al.*—1. The original bill ought to have been dismissed, because all the relief granted was "not only in the absence of appropriate allegations, but in actual contravention of the case made by the bill."—*Rives, Battle & Co. v. Walthall*, 38 Ala. 333; *Alexander v. Taylor*, 56 Ala. 60; *Meadors v. Askew*, 56 Ala. 584; *Gilman, Sons & Co. v. Railroad Co.*, 72 Ala. 566; *Flewellen v. Crane*, 58 Ala. 628.

2. The allowance of an amendment, in a proper case, is matter of right, and not matter of discretion.  The chancellor's discretion extends only to the imposition of terms; and the only limitation upon the right is, that the amendment must not make an entirely new case—must not be a radical departure from the original bill, or make an entire change of parties. Code, § 3790; *Pitts v. Powledge*, 56 Ala. 150; *Harwell v. Lehman, Durr & Co.*, 72 Ala. 346; *Jones v. Reese*, 65 Ala. 135.  The proposed amendments did not make a new case, but only sought to introduce proper and necessary parties, under allegations showing the respective interests of each.  The Seligmans, as the holders of 47 bonds, were proper parties, in order that they might litigate with the Gilmans the priority claimed by the latter; and they might be brought in under a cross-bill, such as this.—*Coster v. Bank of Georgia*, 24 Ala. 37, 65.  John Tucker was a proper party, because he had been appointed trustee, under the provisions of the deed, had accepted the trust, and was in possession of the trust estate, by and with the assent of the bondholders; and as the holder of the legal title, he was a necessary party.—*Lawson v. Ala. Warehouse Co.*, 73 Ala. 294; *Prout v. Hogue*, 57 Ala. 31; *Bibb v. Hawley*, 59 Ala. 405; *McArther v. Scott*, 113 U. S. 396; *Goodman v. Niblack*, 102 U. S. 562; *Webb v. Shaftsbury*,

7 Vesey, 480; Story's Eq. Pl., § 156; *Sedgwick v. Cleveland*, 7 Paige, 291. The Gilmans only objected to Tucker's admission as a party, and they were estopped by their acts, having ratified his appointment, and countersigned the contract under which he assumed possession.—*McCravey v. Remson*, 19 Ala. 438. The Cincinnati, Selma and Mobile Railroad Company, under the allegations of the proposed amendments, was also a proper party, being in possession of a part of the mortgaged property, under a lease by the trustee, confirmed by a majority of the bondholders, including the Gilmans, the term of which would probably extend beyond the foreclosure sale.

3. The doctrine of subrogation is not applicable to this case. Subrogation is a mere creature of equity, not springing out of any contract, or agreement, which directly secures to the creditor the right to have his debt satisfied out of the property of the principal; but resting only on the necessity of the case, to prevent a failure of justice, when no other remedy exists; and never applying where the securities or liens sought to be reached attach to the debt itself in the first instance, nor where the surety has no right to discharge or surrender the securities. Here, the mortgage is given for the equal security and benefit of all the bondholders; the statutory lien secured to the State is equally intended to provide for the payment of the indorsed bonds in the first instance, whereby the State would be saved harmless; the holders of the indorsed bonds, having purchased the bonds on the faith of the indorsement, became parties to the contract, and are entitled to enforce it; the State has never paid or acquired any of the indorsed bonds, and it can not be sued on its indorsement; nor can any of the bondholders, through the State, acquire any priority or superior right over others, in violation of the rule, that equality is equity.—*Life Insurance Co. v. Reeder*, 18 Ohio, 35; *Jones v. Bank*, 29 Conn. 25; Jones on Mortgages, vol. 1, § 387; *McMullen v. Neal's Adm'r*, 60 Ala. 555; *Thrall v. Spence*, 10 Conn. 139; *Chamberlain v. Railroad Co.*, 92 U. S. 306.

4. The original bill was not framed as a general creditors' bill, but the cross-bill of these appellants, under which only relief was granted, was in that form. Under such a bill, if there is sufficient evidence, a reference to the master or register is ordered, but nothing is decided as to the merits o any claim. The parties go before the register, each on his own merits, with equal right to prove his own claim, and to contest every other claim.—Story's Equity, §§ 548, 549; Story's Eq. Pl., §§ 101, 158; *Galveston Ralroad Co. v. Cowdry*, 11 Wall. 477; *Whitaker v. Wright*, 2 Hare, 310. Here, on the former appeal, Morton, Bliss *et al.* did not complain, and did not assign errors, because the decree gave no preferences, but placed all

creditors then before the court on an equality. This decree was reversed on appeal, at the instance of Gilman, Sons & Co., who alone complained of it. After the reversal and remandment, other creditors were not allowed to be brought in as parties, but were given permission to come in before the register, prove their claims, and contest the claims of all other creditors and claimants, "except the priorities hereinbefore ascertained and established"—that is, the preference awarded to Gilman, Sons & Co. Other creditors did come in and prove their claims, and some of them were held entitled to equal rights with Gilman, Sons & Co.; but, while their claims were contested by Gilman, Sons & Co., they were not allowed to contest or question the standing of these preferred creditors    This is an unusual practice under a creditors' bill, and amounted in effect, as to these new creditors, to a deprivation of their property rights without a hearing in court. Of course, no evidence could be adduced before the register, contesting or impeaching the claims of Gilman, Sons & Co., since the register was bound by the chancellor's adjudication as to their standing; but this does not authorize the inference that no such evidence could have been offered.—*Rice v. Drennen,* 75 Ala. 337.

5. Gilman, Sons & Co. are not entitled to any preference over other bondholders, under either their pleadings or the evidence. In their answer, they claim under the mortgage, or deed of trust, as the holders of bonds thereby secured; and their additional claim of a statutory lien, if well pleaded for any purpose, can not be allowed to antagonize the terms of the deed.—*Reaves v. Garrett,* 34 Ala. 558; *Morris v. Hall,* 41 Ala. 527; *Hatchett v. Blanton,* 72 Ala. 423 : *Hart v. Johnson,* 6 Ohio, 87. But the pleadings nowhere claim or show a right to priority over other bondholders, arising out of the misapplication of the bonds by DuPuy, and notice of that misapplication to other bondholders; and allegations of mere legal conclusions, unsupported by facts, are clearly insufficient. *Willingham v. Harrell,* 36 Ala. 580; *Duckworth v. Duckworth,* 35 Ala. 70; *Flewellen v. Crane,* 58 Ala. 628. Nor is their claim of priority established by the evidence. The *onus* was on them to show that they purchased the bonds for valuable consideration, before maturity, without notice of any defect or infirmity of title; and notice of facts sufficient to excite suspicion, and put them on inquiry, was sufficient to charge them with notice of every fact that would have been discovered on inquiry.—*Ross v. Drinkard,* 35 Ala. 437; *Reid v. Bank of Mobile,* 70 Ala. 199; *Mayor of Wetumpka v. Wharf Company,* 63 Ala. 632. Three of the partners deny notice, but the fourth partner is not examined as a witness; and John Tucker testifies positively, with great circumstantiality of detail, that

he gave them full notice, pending their negotiations with Crawford. His language, speaking of his first interview with their senior partner, is : "I can not give the exact date of the interview, but it was before the negotiations between the parties were concluded, and the exchange of bonds and stocks made. . . I had said interview to impart to them such information as I had about the said railroad corporation. The *status* of said railroad corporation, the *status* of said bonds, and the circumstances surrounding the enterprise, were all mentioned and discussed at said interview. They inquired of these matters. I was possessed of information about all these matters, and I did not withhold from them any information I possessed. I was familiar with all the facts and circumstances with respect to said railroad, said bonds, and the circumstances under which they had been issued ; and I imparted all the information I had to the said senior partner of said firm." This was before the 22d July, 1871, when the bonds were delivered and the contract consummated, and was sufficient notice.—*Sewing-Machine Co. v. Zeigler*, 58 Ala. 221. Notice was thus brought home to Gilman, Sons & Co., of facts at least sufficient to put them on inquiry.—*Foster v. Stallworth*, 62 Ala. 529 ; *Wilson v. Wall*, 34 Ala. 303. Besides, this issue of fact was decided against them by the special chancellor ; and this court will not disturb his decision, unless there is a decided preponderance of the evidence against its correctness.—*Marlowe v. Benagh*, 52 Ala. 114 ; *Phillips v. Phillips*, 39 Ala. 63 ; *Kirksey v. Kirksey*, 41 Ala. 641 ; *Derrick v. Brown*, 66 Ala. 166.

6. But, if the former decision as to the *status* of the Gilmans be adhered to, the same rules, applied to other creditors, will put them on an equal footing with the Gilmans. Morton & Bliss, although they acquired their bonds from DuPuy, had no notice of his misapplication of them, They knew that he had a large contract for constructing the road, and the bonds showed on their face that the company had complied with all the provisions of the statute necessary to entitle it to the State's indorsement. They did not know that work on the road had been suspended, and might well suppose it was still progressing. *Plock v. Cobb*, 64 Ala. 161. It was not material to them, nor to the State, whether their debt was paid with the first bonds, or with bonds issued for any subsequent section of twenty miles. If he had sold these bonds on the market, and paid their debt with the proceeds, no one could have complained ; nor could the title of the purchaser be impeached. The bonds were in regular form, and were commercial paper ; DuPuy was in possession of them, and had the right to dispose of them ; and it is not to be presumed, as said on the former appeal, that he would disclose any defect in his title to a purchaser or cred-

[Morton & Bliss v. N. O. & Selma Railway Co.]

itor proposing to take them. Appellants' title is certainly unassailable, if that of the Gilmans is sustained.—*Murray v. Lardner*, 2 Wall..119 ; *Goodman v. Harvey*, 4 Ad. & El. 780.

7. The Seligmans are purchasers for value without notice, equally with the Gilmans, or any other creditors, unless the past-due coupons attached to their bonds made them dishonored on their face. The authorities are conclusive on this proposition.—*Cromwell v. Sac County*, 96 U. S. 58; *Jackson v. Ludeling*, 21 Wall. 618 ; *Parsons v. Jackson*, 99 U. S. 434 ; *Railway v. Sprague*, 103 U. S. 756 ; *Thompson v. Perrine*, 106 U. S. 589; Dan. Neg. Instr., §§ 787, 1506; Jones R. R. Securities, § 199 ; *Plock v. Cobb*, 64 Ala. 131 ; *Kelley v. Whitney*, 45 Wisc. 110.

8. None of these appellants purchased after the repeal of the act under which these bonds were indorsed, and therefore the repeal of that statute can not affect their rights. Nor can the repeal impair the rights of Nichols, and of Perkins, Livingston & Post, who purchased subsequently. The repeal did not destroy the negotiability of the bonds, nor show a repudiation of its liability by the State.—*Morgan v. United States*, 113 U. S. 476; *Texas v. White*, 7 Wall. 700 ; *Colt v. Barnes*, 64 Ala. 108.

9. On the general equities of the case, the prominent fact is, that all the means with which the road was built were furnished by Morton & Bliss and Crawford, who now ask and offer equality to all bondholders; while Gilman, Sons & Co., who furnished nothing, and paid for their bonds with worthless stocks, seek an unconscionable advantage, and claim a preference.

E. W. PETTUS, D. S. TROY, and WILLIAMSON & HOLTZCLAW, for Gilman, Sons & Co.—1. Each of the rejected amendments proposed to make John Tucker a party defendant, who was appointed trustee pending this suit, and without the sanction or approval of the court. The court might have made him a party, but was not bound to do so ; and properly refused to make him a defendant, on objection by Gilman, Sons & Co. The statute regulating amendments was not intended to require, as matter of right, the introduction of new parties who might acquire any interest by purchase or assignment *pendente lite*, and thereby enable defendants, while in possession of the property, to prolong the litigation indefinitely.—*Love v. Graham*, 25 Ala. 187 ; *Lee v. Lee*, 55 Ala. 590 ; *Webb v. Shaftsbury*, 7 Vesey, 480 ; Hill on Trustees, 269.

2. By the established practice with us, as in other States, the chancellor settles the equities among the parties before the court, and allows others to come in before the register ; and the

cause is not ready for hearing, until this can be done. In a suit for the foreclosure of a mortgage, where there are different classes of creditors, those before the court necessarily represent others of the same class. A rule would be impracticable, which required all the creditors, however numerous, to be brought in, before the general equities of any could be settled.—*Garner v. Pruitt,* 32 Ala. 13; *Campbell v. Railroad Co.,* 1 Woods, C. C. 368; 1 Dan. Ch. Pr. 191, 245, note 6; *1b*: 635; *Neve v. Weston,* 3 Atk. 557; Story's Eq. Pl. § 193, note; *Barber v. Walters,* 8 Beav. 92.

3. As to the *status* of the bonds held by Gilman, Sons & Co., and their right to be subrogated to the statutory lien of the State, the case is presented as on the former appeal, and the former decision is an unanswerable argument in their favor.

4. None of the other bondholders show themselves entitled to share in this preference. Morton & Bliss, taking their bonds from DuPuy, in payment of his debt contracted for materials used in building the first twenty miles of the road, participated in their misapplication, and can claim nothing as against the State.—72 Ala. 566. By the terms of the mortgage, the principal sum became due on default in the payment of interest for ninety days after demand made; and the fact of such demand and default is admitted in the pleadings, and is not denied by any one. All subsequent purchasers are chargeable with notice that the bonds were dishonored. Some of the bonds, when purchased, had past-due coupons attached, for several years interest; and some were purchased after the repeal of the statute under which they were indorsed. None of these bondholders can claim to be purchasers for value, before maturity, and without notice.—*Smith v. Sac County,* 13 Wall. 139; *Boyd v. McIver,* 11 Ala. 822; *Thompson v. Armstrong,* 7 Ala. 256; 1 Dan. Neg. Instr., 580, 644; *Morgan v. United States,* 113 U S. 476; *Andrews v. Pond,* 13 Peters, 65; *Goodman v. Simons,* 20 How. 365. Seligman, Perkins, Nichols and Levy were examined as witnesses after they had filed their bonds; each of them stated when and how he acquired his bonds; each knew when he acquired notice of the default; and his failure to deny that he knew the fact at the time of his purchase, is an implied admission that he then knew it.—1 Greenl. Ev., § 38; 7 Ala. 256; 11 Ala. 822; 42 Me. 202.

SOMERVILLE, J.—There can be no doubt of the general rule, that the question of amendment, in every proper case, in a court of equity, is not limited by the discretion of the chancellor, but is a matter of legal right, so long as the proposed amendment does not work an entire change of the parties, or introduce a radical departure from the case made by the origi-

nal bill. But this rule can not be said to be so universal as to be absolutely without exception.

The statute provides, among other things, that "amendments to bills must be allowed, at any time before final decree, by striking out or adding new parties, or to meet any state of evidence which will authorize relief;" and if such amendment be allowed at the hearing, "the party against whom the amendment is allowed shall be entitled to a continuance, as a matter of right; and if the cause is continued, both parties shall have the right to take additional testimony."—Code, 1876, § 3790.

This section of the Code can not, in our opinion, be construed to authorize as matter of right, in every case, the introduction of parties who have acquired by purchase, or voluntary assignment *pendente lite*, an interest in the subject-matter of litigation. It must be construed in the light of the established rules of chancery practice, which are in harmony with the known purpose of its enactment. One of these prevailing and necessary rules is, that courts of equity are never compelled to take notice of such assignments of interest as result from the voluntary act of parties, as distinguished from mere assignments by operation of law,—as in cases of death, bankruptcy, and the like. The two classes of cases are clearly distinguishable on the soundest principle, both in the light of reason and authority. Whoever purchases property *pendente lite*, takes it subject to the hazards of the pending litigation. The decree against the parties litigant is equally binding on all such purchasers. The unanswerable reason of the rule is, that otherwise chancery suits would be absolutely interminable, at the mere option of the litigants, who would be able, by collusion or otherwise, to protract litigation forever, by the single device of repeated and successive transfers from one to another.—*Cook v. Mancius*, 5 Johns. Ch. 89; Story's Eq. Pl. § 156; Barbour on Parties, p. 361; *Bishop of Winchester v. Paine*, 11 Ves. 194; *Peevey v. Cabaniss*, 70 Ala. 253. In *Sedgwick v. Cleveland*, 7 Paige, 287, where this principle was announced, it was observed by WALWORTH, Ch., that "the assignee who is a mere voluntary purchaser, *pendente lite*, can not defeat the complainant's rights, or delay his proceedings by such purchase; for, if he could do so," he added, "the litigation by successive assignments might be rendered interminable."

It can not be supposed that the General Assembly, in the enactment of our statute of amendments, designed the repeal of so salutary a rule, the effect of which would be to destroy the most vital function of the judicial tribunals of the country, which is to administer right and justice, obediently to the mandate of the constitution, "without sale, denial or *delay*."

The rule in question necessarily embraces the case of trus-

tees of express trusts, who, being the repositories of the legal title, are brought before a court of equity for the full and complete administration of the trust. The reason of the law applies to them, with even greater force than to ordinary assignees; because, otherwise, they might, by collusion, indefi-- nitely procrastinate the settlement of their trusts with the court; and the temptation to do this, in cases of financial embarrassment, is known often to be very great. Hence the prevailing rule, that, when once a court of equity rightfully assumes jurisdiction of the cause in which an express trust is involved, it will not suffer any new appointment of trustees to be made, unless it be done under the immediate sanction and control of the court itself.—Hill on Trustees (2d Ed.), 269; *Webb v. Earl of Shaftsbury*, 7 Ves. 480. The inherent jurisdiction of courts of equity, over the whole subjects of trusts, involves the power of removing trustees for sufficient reasons shown, in all proper cases, and also the correlative power of substituting suitable successors.—Willard's Eq. Jur. 470–471. It becomes necessary, therefore, to obtain the sanction of the court, where a corporation, or other donee of the power of appointment, who has been brought under the jurisdiction of its authority, desires to exercise it.—2 Perry on Trusts, 280–282. The giving or withholding of such sanction must depend upon the facts of each case, and is, necessarily, a discretionary power, to be exercised in such manner as to promote the ends of justice, and not unreasonably for its denial or delay.

We hold, therefore, that a purchaser, or voluntary assignee, *pendente lite*, from a defendant in the cause, is not a necessary party, and only becomes a proper party defendant by the sanction of the Chancery Court, when it is proposed to introduce him by amendment of the pleadings, and objection is interposed by the complainant, or other party whose rights may be prejudiced by delay of the proceedings.

Applying this principle, we see no error in the refusal of the court to allow the amendments proposed to the cross-bill of Morton, Bliss, and others. These amendments were each proposed and rejected as a whole, and each embraced the introduction of John Tucker, and the Cincinnati, Selma, and Mobile Railway Company, as parties defendant. Both of these suggested parties had become interested in the subject-matter of the suit after the filing of the bill, and must be bound by the decree in the cause just as if they had originally been made parties. Tucker was appointed trustee by the directors of the defendant corporation, upon the removal by them of the Union Trust Company, without the approval of the court; and the Cincinnati, Selma and Mobile Railway Company also acquired its lease *pendente lite*. The proposed amendments were vitiated

[Morton & Bliss v. N. O. & Selma Railway Co.]

by including in them these parties, irrespective of other objections urged, which we need not consider.

3. The original bill showed a clear case for equitable relief, and no error can be predicated on the refusal of the court to dismiss it. The complainant, Robertson, was a judgment creditor of the defendant corporation, with a return of "no property found" after the issue of sundry executions on his judgments. This conferred on him a lien on the equitable assets of the insolvent corporation, and entitled him to the assistance of a court of equity in the removal of any improper incumbrance upon its property, which might constitute an impediment to the enforcement of his legal rights. The facts stated in the bill show that the bonds issued by this corporation, and indorsed by the State, which had been delivered to the contractor, DuPuy, had been fraudulently misapplied to uses prohibited by the law which authorized their issue. They are alleged to have been used in constructing the first twenty miles of the road, whereas this was expressly prohibited by the law of their creation. The fact of such mis-use, being alleged to be within the knowledge of the defendants, who are holders of these bonds, would deprive them, if true, of the statutory lien given to the State by the act of February 21st, 1870, to which they would otherwise be entitled as *bona fide* holders upon the principle of subrogation.—Acts 1869–70, p. 149; *Gilman & Sons v. New Orleans and Selma R. R. Co.*, 72 Ala. 566. The powers of a court of law would be totally inadequate to remove this alleged incumbrance from the title of the property sought to be sold, or to ascertain and adjust the conflicting rights of the various bondholders, dependent upon the circumstances under which they acquired these bonds. The only proper forum for a settlement of these questions was a court of equity.—*Dargan v. Waring*, 11 Ala. 988; Bump on Fraud. Conv. 518.

4. The demurrer to the cross-bill of Morton & Bliss was, in our opinion, properly overruled. The theory of the original bill was, that the bonds held by these and the other defendants were not valid liens upon the property of the railroad company, as against the complainant in such bill. The purpose of the complainants in the cross-bill was to establish and enforce a lien, claimed in direct antagonism to the averments of the original bill. The various bondholders, moreover, held opposite interests, and being co-defendants, a cross-bill was both appropriate and necessary in order to adjust their conflicting priorities claimed over the subject-matter involved in litigation. *Cullom v. Erwin*, 4 Ala. 452, 461; *Davis v. Cook*, 65 Ala. 617; 2 Dan. Ch. Prac. 1550.

5–6. We do not propose to review the principles of law settled when this case was last before us on appeal, being fully

persuaded as to their correctness. We are, moreover, satisfied with the conclusion reached in that decision, and here adopted by the chancellor, as to the *status* of Gilman, Sons & Co., in reference to the fifty-eight bonds described in the pleadings as held by them. The evidence now before us does not materially differ from what it was then. After a proper consideration of the facts, we decided that they were *bona fide* holders of these bonds, without notice of the illegal misapplication made of them by DuPuy as the immediate transferree of the railroad company. Upon petition for re-hearing, we declined to modify that conclusion; and after a further consideration of the case, we still adhere to it.—*Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.*, 72 Ala. 566.

Nor do we discover any error in the conclusion attained by the chancellor as to the *status* of Morton & Bliss, in reference to the bonds held by them. It is no where denied that they received these bonds for a large debt due them by DuPuy, for iron furnished to equip the first twenty miles of the road. They sold the iron to DuPuy for this express purpose, and none other, and the fact is so declared in a written contract between the parties, bearing date June 8th, 1870. They are, therefore, conclusively charged with a knowledge of the fact. The appropriation of the bonds to this purpose, so far as the State of Alabama was concerned, was in direct violation of the statute, because, as observed by BRICKELL, C. J., when the cause was last before us for decision, it was "a diversion of the bonds from the uses and purposes to which they were by the statute appropriated, and to which the company, by the very act of procuring and accepting the indorsement, agreed they should be solely and exclusively appropriated."—*Gilman, Sons & Co. v. New Orleans and Selma R. R. Co.*, 72 Ala. 580, *supra.*

The court is of opinion that Morton & Bliss must be charged with notice of DuPuy's illegal use of these bonds, and that, for this reason, they can not be considered as *bona fide* purchasers of them for value without notice. The law under which they were issued required the railroad company to construct the first twenty miles of the road exclusively out of its own resources, and independent of State aid, as an indispensable condition to the indorsement of its bonds by the State; and any expense incurred in building such portion of the road is also prohibited from being *refunded*, in whole or in part, from the proceeds of the bonds indorsed by the State.—Acts 1869–70, p. 152; *Gilman, Sons & Co. v. N. O. & S. R. R. Co., supra.* This is a sweeping prohibition, of plain meaning and purpose.

The bonds themselves make special reference to this statute, under which they were indorsed and issued; and it is not de-

[Morton & Bliss v. N. O. & Selma Railway Co.]

nied that all purchasers of them are charged with notice of its provisions, this being a well-established principle of law regulating the purchase of such securities in the stock markets of the commercial world.—*Morgan v. United States*, 113 U. S. 476; Jones on R. R. Securities, §§ 226, 297.

The claimants knew that their demand against DuPuy was incurred for materials sold by them to aid in building the first twenty miles of the road. They knew that the laws of Alabama forbid the bonds of the road being used for this purpose; and they must have known, therefore, that *prima facie* they were participating in the violation of the law, when they accepted these securities, thus indorsed by the State, in payment of their debt against DuPuy. It was their duty to make inquiry as to the true state of facts, and, had they done so, such inquiry would have disclosed the information that the work on the road had been abandoned after the construction of the first twenty miles. It was entirely immaterial that the Governor of Alabama had required the proof to be made, as provided for by statute, that the portion of the road already constructed had been built from other resources of the company, independent of the aid derived from the State, or that he had indorsed the bonds in the name of the State on the faith of this evidence. The use made of the bonds was prohibited by the statute, without any mention of the time when it might be done. A misappropriation *after* such proof was made to the Governor was just as unlawful as it would have been *before* such executive action. Morton & Bliss can not claim to have been misled by this act of the Governor, in view of the knowledge imputed to them by the facts of this case. They acquired only the right of DuPuy, and received the bonds subject to all the equities attaching to them in his hands.

7. As against the railroad company, however, these bonds were, in our judgment, valid in the hands of Morton & Bliss. They were delivered to DuPuy, it is true, partly in consideration of a promise made by him that they should be used in the further extension of the road, as well as in part payment of a debt due for that portion of the road which he had already constructed. Possibly, the diversion in the use of the bonds subsequently made by him may have constituted a failure of consideration, which could have been urged in defense by the road, unless it was in some manner waived. This we concede only for the sake of argument, without intending to intimate any opinion on the point. The railroad company, although a party to the suit, makes no complaint of this nature. On the contrary, by abandoning any effort to extend the road further by reason of their intervening insolvency, and by continued recognition of their liability to DuPuy, they seem to have ac-

quiesced in the uses to which the bonds were put by him, and have thus waived this defense. The consideration of the bonds can not be impeached, in this particular, by a stranger not standing precisely in the situation of the original parties, and identified in equity by privity of title with them.

The chancellor properly decreed that the lien of the mortgage, or deed of trust, executed by the railroad company to the Union Trust Company, of New York, enured to the benefit of Morton & Bliss equally with the other holders of all the 320 bonds issued by the company and indorsed by the State. But such lien is subordinate to that created by the statute in favor of the State, to which all parties are entitled to be subrogated who are shown to be *bona fide* purchasers for value before maturity, and without notice of existing defenses against the original holder. This mortgage was duly recorded, and this charged the complainant, Robertson, with notice of its existence. The lien of the complainant's judgments described in the original bill were properly, therefore, decreed by the chancellor to be subject to these superior incumbrances.—*Kelly v. Trustees*, 58 Ala. 489; *Colt v. Barnes*, 64 Ala. 108.

8. It is contended in behalf of Seligman and others, that the chancellor erred in so far settling the equities of the case as to adjudge *in limine* the fact of Gilman, Sons & Co.'s *status* as *bona fide* holders of the bonds claimed by them. It is insisted that this question should have been left open for contestation by all creditors who might subsequently appear before the register, and prove their claims under the decree. To deny this right, it is said, is to deprive such parties of their legal rights without giving them a day in court, and, therefore, without due process of law. The argument invoked ignores an established rule of chancery practice, which has never been interpreted to be violative of any principle of *Magna Charta*, or of our Bill of Rights. This rule is, that, when the parties to a cause are numerous, or some of them are unknown, or beyond the jurisdiction of the court, so as not to be subject to its process, but they all belong to a class whose rights are analogous to those of parties actually before the court, because dependent on the same principles of law, the court will often proceed to adjudge the rights of the class as such, and, in the absence of all collusion, the decree will be considered binding upon the whole class who are in like situation.—Story's Eq. Plead. §§ 99–115; 1 Dan. Ch. Pr. 1911. This principle is fully recognized by Rule No. 20 of our Chancery Practice, which makes it discretionary with the chancellor, in such cases, to dispense with bringing before him all the interested parties, and provides that the court may proceed in the cause without making such persons parties, provided it has sufficient parties

before it to represent all the adverse interests of the plaintiff and the defendant in the suit." Nor is it repugnant to the concluding provision found in the same rule, declaring that "the decree shall be without prejudice to the rights and claims of the absent parties."—Code, 1876, p. 164, Rule No. 20. This, as we shall proceed to show, is the right to come in under the decree, and not in antagonism to what is properly settled by it. This is especially true of a creditor's bill, which is usually filed, not only in behalf of parties complainant actually before the court, but also in behalf of all persons of the same class, who afterwards elect to come in under the decree, and make proof of their claims before the register or master. Issues thus fairly tried, and equities thus adjudged, between the parties served with process, are held binding upon those absent, because of this vicarious representation in the person of litigants of the same class to which they belong. "The other creditors," as Mr. STORY observes, "may come in *under the decree*, and prove their debts before the master to whom the cause is referred, and obtain satisfaction of their demand equally with the plaintiffs in the suit; and under such circumstances they are treated as parties to the suit."—Story's Eq. Pl. § 99. And while it is true, generally, that each creditor, who may afterwards appear and prove his claim, may contest the claim of every other creditor, this right is subject to the exception, that it must be exercised in conformity to the principles settled by the decree under which the reference was had, and nothing settled by this decree is allowed to be re-examined by the register, who, under our practice, discharges the functions of a master.—2 Dan. Ch. Pr. 1210.

While these principles of chancery practice are admitted by counsel, their logical consequences are nevertheless denied. It can scarcely be contended that the register committed any error in refusing to permit Seligman and others to re-try before him the issues settled by the decree of reference. But, as we understand the argument, the objection is, that the chancellor rendered a decree in which he undertook to settle any equity before all the creditors had been brought before the court by proof of their claims. There is no complaint of any refusal on the chancellor's part to correct any alleged error in his decree, upon the evidence before him at the time of its rendition. The objection urged, it will be seen at a glance, assails the right of the chancellor to render any final decree, settling the equities of a class, until after a reference has been made to the register, and all persons interested, however numerous, have appeared in court by making proof of their claims. A sufficient answer to this position is, that the contrary practice is settled in this State, on a basis too solid and ancient to be disturbed at

this late day. The common practice has always been, to permit the chancellor to render a decree settling all the equities in the case, which are disclosed by the bill, prior to making a reference. "These equities embrace the substantial merits of the controversy—the material issues of fact and law litigated, or necessarily involved in the cause, which determine the legal rights of the parties, and the principles by which such rights are to be worked out."—*Adams v. Sayre,* 76 Ala. 509, 517; *Cochran v. Miller,* 74 Ala. 50; *Malone v. Marriott,* 64 Ala. 486; *Walker v. Crawford,* 70 Ala. 567; *Jones v. Wilson,* 54 Ala. 50; *Garner v. Pruitt,* 32 Ala. 18.

One of the equities involved in the present case, and raised by the pleadings, was, whether Gilman, Sons & Co. were *bona fide* holders of the bonds claimed by them, and purchasers of the paper for value before maturity, and without notice. This issue was fairly litigated between the complainant as a judgment creditor, and with Morton & Bliss and others as representing the other bondholders secured by the deed of trust, whose interest it was to defeat the priority thus claimed by and adjudged in favor of Gilman, Sons & Co. If one of the other bondholders, who afterwards might appear before the register and make proof of his claim under the decree, could introduce new evidence, and thus re-open the case on the reference, why may not every other bondholder and judgment creditor do the same? And, if each can do so successively, as they are permitted to come in, when is the litigation to cease in the given cause? It is not to be lost sight of that, in the case of stock companies, and large corporations whose capital stock is now often valued at millions of dollars, the number of litigants will not improbably be numbered by thousands. If the Chancery Court in such cases be prevented from rendering a decree which would preclude the right of perpetual litigation, the utility of the rule allowing a single creditor to represent the class to which he belongs, would be defeated, and especially would its main purpose of saving expense and delay be practically frustrated. It has often been objected before, that this rule operates unjustly against all parties not before the court when the decree was rendered; but to this objection it may be answered, that "it is better to go as far as possible towards justice, than to deny it altogether."—*Cockburn v. Thompson,* 16 Ves. 328, 329.

9. One question raised in this case is, whether the failure to pay interest on coupon bonds before the principal of such bonds is due, standing alone, so dishonors the paper as to subject it to antecedent equities in the hands of an otherwise innocent purchaser for value. It is insisted that there is no difference, in reason, between a failure to pay interest, and a failure to pay principal, and that, when one purchases bonds, the principal of

which is not due, but with coupons attached that are past-due, the paper is dishonored on its face, and the purchaser acquires only the title of his immediate vendor, affected by all existing equities.

It is certainly true that the only holder to whom the law merchant accords full protection is the *bona fide* purchaser for value, without notice, and before maturity. Purchasers of bonds, and other commercial paper past-due, take only the right and title of their immediate vendors.—*Texas v. White,* 7 Wall. 700; *Fenouille v. Hamilton,* 35 Ala. 319.

There seems to be no difference of opinion on the proposition, that where the principal of the bond or bill is payable in installments, the paper becomes dishonored by a failure to pay any one installment, which is overdue.—1 Danl. Neg. Instr. § 787; *Vinton v. King,* 1 Allen, 562.

But, according to the weight of authority, in our opinion, this rule is not strictly applicable to a failure to pay interest. Some courts, it is true, have repudiated this distinction, and have held, with much reason, that the payment of interest stands on precisely the same footing as the payment of the principal, and that the failure to pay either dishonors the paper.—*Nevell v. Gregg,* 51 Barb. 263; *First Nat. Bank of St. Paul v. County Comm'rs,* 14 Minn. 77. But this does not seem to be the view generally adopted, especially as applicable to coupon bonds, which may be regarded as an invention of modern commerce, and have recently become so common a subject of merchandise in the stock markets of the commercial world.

In *Boss v. Howit,* 15 Wis. 260, decided by the Supreme Court of Wisconsin in the year 1882, it was held that the maturity of a note, within the meaning of the law-merchant, is the time when the principal falls due, and that the interest being due when one comes into the possession of commercial paper by purchase, does not make him a purchaser after maturity, so as to let in defenses that might have been made as between the original parties. This view was subsequently affirmed by the same court in the case of *Kelley v. Whitney,* 40 Wis. 110; s. c., 30 Amer. Rep. 697.

In *Brooks v. Mitchell,* 9 M. & W. 14, where a promissory note, payable on demand, had been indorsed several years after date, and no interest had been paid on it for three years before such transfer, it was held not to be dishonored as overdue by reason of this fact, in the hands of a holder otherwise without notice of any existing defense or infirmity of title. In this case it was observed by Baron PARKE, that "a promissory note, payable on demand, is intended to be a continuing security."

In *National Bank v. Kirby,* 108 Mass. 497, the court declined

to place the non-payment of interest and principal, in such cases, upon the same basis, and, after indorsing, in substance, the doctrine of the foregoing cases, observed as follows: "There is a large class of negotiable securities, the principal of which is payable only at the end of many years, but with interest payable either annually or semi-annually; and many of the notes given in the purchase of real estate and secured by mortgage, especially in the country, are of this class, as are most of the obligations for debt contracted by public, and many of those incurred by private corporations; and it is important that the value due to their negotiable character should not be impaired by new rules tending to lessen their currency and credit." It was, however, held by the court, that the fact of interest being overdue was one to be considered by the jury, in connection with other circumstances, as affecting the question of good faith in the holder, and the probability of his having had notice of existing equities at the time of his purchase.

The same doctrine has been approved by the Supreme Court of the United States, in many decisions, especially as applicable to coupon bonds. In *Cromwell v. County of Sac*, 96 U. S. 51, it was decided, that the mere fact of one installment of interest being overdue and unpaid, disconnected from other facts, was insufficient to affect the position of one who was otherwise a *bona fide* purchaser of coupon bonds for a valuable consideration. "The interest stipulated," said Mr. Justice FIELD in this case, "was a mere incident to the debt. The holder of the bond had his option to insist upon its payment when due, or to allow it to run until the maturity of the bond—that is, until the principal was payable." The court further said: "To hold otherwise, would throw discredit upon a large class of securities issued by municipal and private corporations, having years to run, with interest payable annually or semi-annually. Temporary financial pressure, the falling off of expected revenues or income, and many other causes having no connection with the original validity of such instruments, have heretofore, in many instances, prevented a punctual payment of every installment of interest on them as it matured; and similar causes may be expected to prevent a punctual payment of interest in many cases hereafter. To hold that a failure to meet the interest as it matures renders them, though they may have years to run, and all subsequent coupons, dishonored paper, subject to all defenses good against the original holders, would greatly impair the currency and credit of such securities, and correspondingly diminish their value."

The doctrine of this case was approved in *Railway Co. v. Sprague*, 103 U. S. 756, where it was held, that the presence

of two unpaid coupons overdue upon bonds, the principal of which was not due, would not, of itself, be sufficient evidence of the dishonor of the paper to which they were attached. The court distinguished the case from *Parsons v. Jackson*, 99 U. S. 756, where a contrary assertion of Mr. Justice BRADLEY was pronounced to be a *dictum*. In the latter case, there were other pregnant evidences of the invalidity of the bonds, besides the fact of the coupons being overdue. The place of payment was left unfilled on the face of the bonds themselves. Coupons overdue remained unpaid for a great number of years, and the bonds were purchased for the small consideration of from ten to fifteen cents on the dollar. These facts, taken together, were held to be sufficient evidence of the dishonor of the paper; and it was said that "the opinion must be restricted to the case before the court."

In *Thompson v. Perrine*, 106 U. S. 587, where the contention was that coupons, which were detached from the bonds, and overdue when purchased by the plaintiff, were dishonored, and therefore not negotiable by the law-merchant, the court refused to sustain the point, and held that, the bonds not having matured at the time of the purchase, the coupons, though overdue, had not lost the quality of negotiability.

In *Morgan v. United States*, 118 U. S. 476, 501, after a full review of the previous decisions, and a recognition of the principle, that a demand must be made in a reasonable time for paper payable on demand, as coupons usually are, the rule in question was again approved, with the assertion, that any holder of a coupon bond "had a right, without prejudice except as to the loss of interest, to wait without demand for the whole period at the expiration of which the bond was unconditionally payable."

In *Plock & Co. v. Cobb*, 64 Ala. 127, 158, the following language was used by this court: "The dishonor of the unpaid coupons for interest did not infect with dishonor the bond or other coupons, putting on inquiry those who in the usual course of trade, in good faith, and upon a valuable consideration, should acquire them."—See Jones on Railroad Securities, § 199; Danl. on Negotiable Instr., § 1506 *a*; Colebrooke on Collateral Secur., § 46.

We adopt the rule announced in *Railway Co. v. Sprague*, 103 U. S. 756, among other reasons, because of its simplicity and certainty. If a failure to punctually present coupons attached to such bonds, now so rapidly increasing as a part of the vast circulating capital of the country, is to operate to dishonor them on their face as matter of law, the question may arise as to how many coupons will be required to have this vitiating effect. Shall the courts name a dozen, or a score?

Or, if not, in what manner is the fatal number to be ascertained, so as to establish a fixed rule by which the purchasers of such paper may be intelligently governed when they enter the market for an investment? "Certainty," said Lord HARD-WICK, "is the mother of repose, and therefore the law aims at certainty."— *Walter v. Tryon*, 1 Dickens, 245. "It is better that the law should be certain," Lord ELDON observed, "than that every judge should speculate upon improvement in it." *Sheddon v. Goodrick*, 6 Ves. 497. And we may add, that it is often more important that a rule of law should be fixed, even though with less of reason in it, than that it should be vague and uncertain, but with a better show of reason.

The opposite rule, which is contended for by the learned counsel with such ability and earnestness, would not necessarily operate to protect the makers of dishonored paper, who have just defenses, because of the facility with which holders could remove overdue coupons before putting them on the market. It might rather tempt to the frequent commission of fraud, by clipping such coupons from the bonds prior to selling them.

It is obvious, moreover, that great inconvenience, if not injustice, would result, in having one rule prevailing in the Federal courts, and another in the State courts, affecting the title of commercial paper. Litigants who were non-resident would resort to the Federal courts to sue on such paper, where ample security would thus be afforded their titles. The State courts would deny this protection to resident citizens, under precisely the same state of circumstances. What was justice in one court would thereby be adjudged to be injustice in the other. Commerce, on the other hand, is broad and expansive, and is growing more so with the progress of civilization, and with every new discovery of modern art and science. Uniform rules, therefore, are desirable, which, being based on liberal and comprehensive principles of public policy, will be recognized as of force in every commercial centre, where its currents are permitted to ebb and flow freely and without restriction.

There is, however, one aspect in which, according to all the authorities, the presence of overdue coupons upon such bonds is material and important. While not conclusive of the fact of dishonor, "it is still a fact proper to be considered by the jury, in connection with other circumstances, on the question whether the holder is entitled to the position of one who has taken it in good faith, and without actual or constructive notice of existing defenses."—*National Bank v. Kirby*, 108 Mass. 497. It goes, in other words, to the question of good or bad faith, because it may often tend to show that the purchaser had notice, actual or constructive, of the fact of dishonor. Taken

[Morton & Bliss v. N. O. & Selma Railway Co.]

in connection with other significant facts, it may become convincing, and even conclusive.—*Cromwell v. County of Sac*, 96 U. S. 58; *Railway Co. v. Sprague*, 103 U. S. 756.

10. The rule is now settled in this State, in harmony with the general weight of authority in this country and England, that mere suspicion on the part of the purchaser of negotiable paper, or knowledge of facts which would, in the mind of a prudent man, excite suspicion, of a defect in the seller's title, is not sufficient to impair or vitiate the title of such purchaser. To have this effect, there must be bad faith on his part.—*Gilman, Sons & Co. v. N. O. & Selma R. R. Co.*, 72 Ala. 566; *Murray v. Lardner*, 2 Wall. 110; *Farrell v. Lovett*, 68 Me. 326; s. c., 28 Amer. Rep. 59; *Kelley v. Whitney*, 30 Amer. Rep. 697. And while gross negligence is not itself the same as bad faith, it may be evidence of it, inasmuch as the act of negligence may be so wanton as to afford good ground for believing that it was intentional and fraudulent.—1 Parsons Notes & Bills, 259. The test is, whether the facts, of which the purchaser has notice, are inconsistent with any other view than that "there is something wrong in the title" of the seller. 1 Dan. Neg. Instr. § 796; *Parsons v. Jackson*, 99 U. S. 441. Bad faith will not be imputed, unless, as said by Mr. Parsons, "there be something in the particular transaction which is equivalent to fraud, actual or constructive."—1 Parsons on N. & B. 257. But a deliberate and intentional avoidance of knowledge, or a willful closing of the eyes to facts, will be construed to have the same effect as knowledge or actual notice. 1 Dan. Neg. Instr., §§ 796, 799; Jones on R. R. Securities, § 299.

11. It is argued, however, in this case, that the principal of the bonds, as well as the entire interest, became due in July, 1872, under the terms of the contract, by reason of the failure of both the State and the railroad company to pay the coupons then matured; and that all purchasers after this date are to be regarded as purchasers after the dishonor of the paper, and therefore not entitled to protection under the settled rules governing the transfer of commercial paper. That the bonds were due at this time, seems to admit of no controversy. The fact is alleged, and admitted on all hands in the pleadings, and is established by the evidence. If any purchaser knew this fact, or was chargeable in law with notice of it, at the time of his purchase, it is clear that the contention must be sustained.

We have said that every holder of these indorsed bonds must be presumed to have knowledge of the laws of Alabama by authority of which they were created and put in circulation. *Morgan v. United States*, 103 U. S. 477. The bonds themselves make reference to the act of February 21st, 1870, and

also to the mortgage, or deed of trust, by which they are se-
cured.   This also imputes knowledge, no doubt, of the contents
of the mortgage.—Jones on R. R. Securities, § 299.   This in-
strument provides, that the entire principal and interest shall
become due and payable, within ninety days after a refusal to
pay the semi-annual interest due by said coupons, *after* demand
made at the office or agency of said defendant corporation in
the city of New York.   If it appeared from the testimony in the
cause that any holder, at the time of his purchase, knew the
fact that there was a refusal to pay after a demand had been
made under the terms of the mortgage, it may be admitted that
a defense on his part against equities attaching to the bonds in
the hands of his immediate vendor would certainly be unavail-
able.   But this is an extrinsic fact foreign to the face of the
paper.   It is not a mark on the instrument, but a latent fact
outside of it.   It does not, therefore, operate to dishonor the
paper on the face of it, so as to openly disgrace it in the hands
of the holder.   The law does not charge him with notice of
this fact, unless he either knows it, or exhibits bad faith by in-
tentionally avoiding a knowledge of it.   We mean, of course,
by knowledge, information imputed by law, which may be con-
structive as well as actual.   Under the rule which we have
above discussed and adopted, the failure to present overdue
coupons, before the maturity of the bond itself to which they
are attached, does not dishonor the paper on its face.   Igno-
rance of the fact of such demand, therefore, is not necessarily
imputable to bad faith by reason of a neglect to make inquiry,
or evidence conclusive of fraudulent intent.   It does not, stand-
ing alone, show that the holder was sufficiently put on inquiry
that there was something wrong about the title of the paper, or,
using the language of Lord Ellenborough in *Tinson v. Francis*,
1 Camp. 19, that the paper had come disgraced into the hands
of the purchaser.

It is true, as asserted in argument, that all of the litigants
admit in the pleadings that there was such a demand and re-
fusal to pay, and that thereby the principal of the bonds became
due in the year 1872, as well as the entire interest; but this is
not an admission that they knew this to be true at the time of
their respective purchases,—a fact which is negatived by an ex-
press denial of all notice.   When it was shown that a fraudu-
lent use had been made of the bonds, the burden was on the
holders to show that they were *bona fide* purchasers for value
in due course of trade.   This proof being made, the burden
was again shifted on those assailing the validity of the bonds to
prove notice to the purchaser of any alleged defect in the title
of the transferror.   The fact of such notice has reference to
the time of the purchase, and not afterwards; and time is,

therefore, of the very essence of such proof, and a part of it. The principal of the bonds, in our opinion, could not be considered as having matured, within the meaning of the law-merchant, and so as to vitiate the holder's title, when the fact of such maturity depended upon an extrinsic circumstance of which the holder knew nothing, either actually or constructively. Such a rule would be repugnant to the most fundamental principles of our entire system of commercial law, which is based on the policy of affording full protection to innocent purchasers.

It is further contended that such of the bond holders as purchased after March 17th, 1875, were charged with notice of the fact that the bonds had been dishonored from refusal to pay, because on that day the General Assembly of Alabama in effect repudiated the liability of the State, as indorser of the bonds, by repealing the act of February 21st, 1870, under which the indorsement was made, and by which provision was made for their future payment by the State, in the event of a default of payment by the railroad company as maker.—Acts 1874–75, p. 269. This being a public law, a knowledge of which was imputable to every holder of these bonds; the law repealing it was equally so, and was a fact of which no holder had a right to be ignorant. There was no other manner in which the State could constitutionally and authoritatively declare its *status* and purposes on the subject, than by speaking through a public law. The effect of this repealing law was to withdraw from every State official all authority to proceed under the abrogated law to make payment of the bonds in any event. It was alone by virtue of the provisions of this law that the Governor was authorized to negotiate temporary loans, if needed, to pay the interest on them. It was by a like authority, and that only, that the Auditor of the State was empowered to draw his warrant upon the treasury of the State, for the purpose of paying such interest, in the event of a failure of the railroad company to make provisions for its prompt payment.—Acts 1869–70, sec. 4, p. 153. The constitution and laws of the State provide, in plain terms, that no money shall be paid out of the treasury except upon appropriation made by law, and on warrant drawn in pursuance therof by the proper officer, who is designated, *eo nomine*, to be the Auditor.—Const. 1875, Art. IV, § 33; Code, 1876, §§ 85, 187. Whether this repealing act was strictly an open repudiation by the State of its liability as indorser of these bonds, such as to dishonor them *ipso facto*, we need not decide. It was certainly a significant circumstance, sufficient to put the purchaser on inquiry, and charge him with notice of the fact that there was something wrong about the bonds ; especially when taken in connection with the other fact, that, at the time of such repeal, several

years of overdue coupons remained unpaid, and were attached to the bonds.

In applying the foregoing principles, we need not enter into any protracted discussion of the testimony. The chancellor, in our opinion, has properly found that J. & W. Seligman & Co. were *bona fide* purchasers for value, and before maturity, of the forty-seven bonds held by them, without notice of any existing infirmity of title. The evidence is, in our minds, satisfactory to show that they became purchasers of these bonds prior to March 17th, 1875, when the act of February 21st, 1870, was repealed. The fact of the coupons for four years being overdue and unpaid, was not alone sufficient to impute bad faith to the holders in their failure to make inquiry as to the real *status* of these bonds ; nor was the fact sufficient to dishonor the paper, when taken in connection with the other facts of the case known at the time to such purchasers.

Perkins, Livingston & Post are shown to have purchased their two bonds in April, or May, of the year 1877, and, therefore, after March 17th, 1875. Eleven coupons were then overdue upon them. The chancellor erred in decreeing that they were *bona fide* purchasers for value without notice.

He likewise erred, under the foregoing principles, in holding W. S. Nickols to be entitled to protection as an innocent purchaser of the ten bonds bought by him in February, 1883, for which he paid only twenty cents on the dollar.

The same we hold to be true as to his finding as to the fifty bonds owned by A. W. Jones and his associates, and purchased in 1884 from Levy, who himself bought from Barlow after February, 1880. It needs no argument to show that Barlow, as Crawford's administrator, held no better title than Dupuy ; and we have shown that, in his hands, all of these bonds were subject to existing equities in favor of the State.

The above named parties, not being *bona fide* purchasers for value, in due course of trade, without notice, are not entitled to be subrogated to the statutory lien of the State as indorser of these bonds. But they will be allowed to come in subordinately with the other creditors, in like condition as being secured by the mortgage, or deed of trust executed by the defendant corporation to the Union Trust Company of N. Y.

We find no other errors in the decree of the chancellor.

The decree will be reversed, and a decree rendered in this court, in substance the same as that rendered by the chancellor, except as to the errors above pointed out.

The costs of the case in this court, and in the court below, so far as they remain unpaid, will be paid out of the proceeds of the sale of the road, its franchises and other property, included in the deed of trust and prayed to be sold.

[Morton & Bliss v. N. O. & Selma Railway Co.]

SOMERVILLE, J.—An application is made in this cause, by the attorneys of Morton & Bliss, for the allowance to them of counsel fees, to be paid out of the general fund which may accrue from the sale of the property, which is declared to be subject to the lien of the mortgage described in the pleadings. A like application is also made in behalf of the counsel for the complainant in the original bill, who sues as a judgment-creditor of the defendant railroad company.

We are also asked to modify the decree, so as to allow to Seligman & Co. the right to prove for the full amount of the forty-seven bonds held by them as collateral security, and to permit them to retain so much of the proceeds of these bonds as they may recover, not in excess of the debt for the security of which the bonds were received.

We propose to first consider the questions involved in the last suggestion.

1. It is decided that Seligman & Co. are *bona fide* holders of these bonds, without notice of any infirmity of title attaching to them, and that as such they are entitled to protection as purchasers for value, having received them as collateral security pursuant to an agreement made at or before the time of advancing their money upon them. The face value of these collaterals is greatly larger in amount than the debt secured by them.

The pledgee of negotiable paper, who is a *bona fide* holder for value, and before maturity, is practically the owner of such paper, and is entitled to be protected to the extent of his debt, as fully as if he were the owner, He may, ordinarily, sue on such collaterals in his own name, and, in the absence of any defense, is entitled to recover for their full amount. From the sum thus recovered he can rightfully deduct his debt, with interest and costs, and the surplus he holds as trustee for the pledgor.—Jones on Pledges, §§ 89, 669–670; Colbrooke on Collat. Sec., §§ 85, 87, 90, 143; *Tooke v. Newman*, 75 Ill. 215.

Where the negotiable paper, which is thus pledged, is without consideration, or is subject to prior equities, or has been fraudulently misappropriated, the pledgee, if a *bona fide* holder for value before maturity, may nevertheless prove or sue for the entire amount of the collaterals, but can recover no surplus over and above the amount of his debt or advances, with proper costs of suit. He is the pledgee of the entire debt or demand represented by the collateral transferred to him, and not of a mere fractional part of it. The primary purpose of the pledge was to place in his hands the means of paying his debt. If he is permitted to prove only for an undivided or fractional part, it must be upon the theory that he is the transferree of an interest less than the whole. The true intention

of the contracting parties can be carried out, only by giving the pledgee the full indemnity afforded by the collaterals held by him in pledge, to the extent of his debt or advances.—Colbrooke on Collat. Sec., §§ 78, 92, 70, 143, 177; *Swift v. Smith*, 102 U. S. 442; *Davis v. Leopold*, 87 N. Y. 620; *Railroad Co. v. Nat. Bank*, 102 U. S. 14; *Fisher v. Fisher*, 98 Mass. 303; *Union Nat. Bank v. Roberts*, 45 Wis. 373.

In *Stoddard v. Kimball*, 6 Cush. 469, the plaintiff sued as pledgee of a negotiable note, which had been transferred to him as collateral security for a debt less in amount. The transfer or pledge was made in fraud of the indorser and other parties to the paper. The facts showing him to be a *bona fide* purchaser before maturity, it was held that he could recover so much of the note as would satisfy his claim for which it was pledged as security. SHAW, C. J., said: "It being obvious that the plaintiff can recover nothing as trustee for the party from whom he received it (*i. e.*, the collateral), he is liable over to nobody for the surplus, and therefore can have judgment only for the amount due to himself, for his own use, and in his own right, which is so much of the note as may be necessary to satisfy the balance of the debt, for the security of which he received it."

In *Chicopee Bank v. Chapin*, 8 Metc. (Mass.) 40, a like ruling was made, the plaintiffs being held entitled to recover "to the amount of the note, for which they took the note in suit as collateral security."

In *Duncomb v. New York R. R. Co.*, 84 N. Y. 190, where a railroad mortgage had been foreclosed by trustees, and numerous pledgees of bonds appeared, holding them as collateral security for debts due from third persons, they were allowed to prove for the full amount of these bonds; but their recovery was limited to the amount of the claims for the security of which they respectively held these collaterals. This ruling of the referee was approved by the court, without so much as questioning its correctness.—See, also, *Williams v. Smith*, 2 Hill (N. Y.), 301; *Allaire v. Hartshorn*, 21 N. J. L. 663; Colbrooke on Collat. Sec., §§ 78, 92; Jones on Pledges, § 674.

In England, the more recent rule in bankruptcy, based on general principles of equity, is to permit the holders of collateral securities, who are *bona fide* purchasers for value, to prove for the whole amount of such collaterals, with this limitation only, that they can not receive dividends in excess of the debt for the security of which such collaterals are held. And this rule applies where the paper pledged has been fraudulently issued, or is otherwise without consideration.—*Ex parte Newton*, 16 (L. R.) Chan. Div. 330 (1880–81); *In re Gomersall* 1 (L. R.)

[Morton & Bliss v. N. O. & Selma Railway Co.]

Chan. Div. 137 (1875–76) ; *Ex parte Cook*, Montagu's Rep. 228.

If this were not the rule, the absurd result would follow, that one pledgee, who holds *one hundred* bonds, of one thousand dollars each, for example, would be no better secured than another who holds only *one* of such bonds, the debt secured being, we will say, one thousand dollars. Can a rule be sound which would produce this strange sequence? Would it comport with the fundamental principles commonly supposed to govern the rights of transferrees of commercial paper, that the purchaser of a hundred bonds will obtain no more of value, nor better indemnity, than the purchaser of one bond of the same kind and denomination, when the very intention of the contracting parties may have been the contrary? Such is not our view of the law.

These conclusions are not, in our judgment, affected by the rule of subrogation prevailing in this State.

Under the influence of these principles, it is perfectly clear that Seligman & Co. should be permitted to prove for the entire amount of the collaterals held by them ; but the amount of their recovery can not exceed the debt for the security of which these collaterals are pledged, with lawful interest added.

2. It is equally clear, in our opinion, that the right of the pledgees, Seligman & Co., can not be extended so as to give them a lien on these bonds for counsel fees, incurred by them in this litigation. They are holders for value, only to the extent of their advances on these bonds, and interest. Counsel fees can form no part of this debt, because they accrued as an independent obligation, and after the pledge was made, and the bonds were never transferred with any intention of securing such a claim. The precise question arose in *Bank v. Hemingway*, 34 Ohio St. 381, and was decided as we have above held. It was said by the court that, "as against the maker, who has a valid equitable defense to a note in the hands of the payee, if the latter pledges it as security for a debt, the pledgee can only be regarded as a *bona fide* holder of the note to the extent of his interest at the time he acquires the title, or has notice of the defense to it. If the pledgee sues the maker upon the note, the latter may attempt a complete defense, without, in case of failure, thereby incurring a liability to pay the pledgee anything in addition to the amount of the debt secured by the note." There are cases, perhaps, we may add, where the pledgee, suing to enforce the collection of a collateral, has been permitted to deduct counsel fees from the amount realized by suit; but this would be at the expense of the pledgor, and not of an innocent third person, who could in no wise be responsible for so extraordinary an expenditure.

3. We come next to consider the claim of counsel fees, which

we are urged to allow in the present suit. It is our opinion, that the present case is not one in which such a claim can be charged against the general fund which may be realized from the sale of the mortgaged property. The fundamental principle on which such allowances are justified is, that a trust estate should bear the expenses of its administration in a court of equity. Where a trustee, acting with fairness and impartiality, resorts to necessary litigation in order to rescue a trust estate from waste or destruction, and succeeds by his efforts in doing so, he is entitled to reimbursement out of the fund itself, for reasonable expenses incurred in prosecuting such suits, including a proper sum for attorney's fees. A like rule is applicable, where a creditor institutes a suit in equity, not exclusively for his own benefit, but for the joint benefit of himself and other creditors of the same class to which he belongs. It will be observed that the co-complainants, in suits of this nature, all have a similar interest in the subject-matter of litigation—a common, and not an antagonistic interest in the trust fund, which has been brought under the control of the court. The necessary expenses of the original complainant incurred in litigation may very well, under these circumstances, be made payable out of the common fund, or else all, who are permitted to come in and avail themselves of the benefit of his labor, be required to contribute proportionally to such expense, as a condition of receiving such benefit. It would be inequitable for one alone to bear the burden, and others to come in and reap the fruits. The fruits of the litigation enuring equally to the benefit of the whole class concerned, they are equally taxable with the costs and expenses. The services of the counsel employed constitute a necessary part of such expenses. The attorneys for the original complainant are also the attorneys for all who unite with him in the suit, or who afterwards are permitted by the courts to come in, and participate in the fruits into which the proceeding may ripen.—*Trustees v. Greenough*, 105 U. S. 527; *Railroad and Banking Co. v. Pettus*, 113 (Wall.) U. S. 116; *Grimball v. Cruse*, 70. Ala. 534. Unless this relation exists, the court will not be justified in making counsel fees a burden on the trust fund, merely because the services rendered by such counsel incidentally enure to the benefit of all the creditors who succeed in establishing their claims.—*Lehman v. Tallassee Man. Co.*, 64 Ala. 567.

The largest preferred claim which has been allowed in the present case is that of Gilman, Sons & Co., who are decreed to be entitled to the lien secured by the statutory mortgage of the State of Alabama. Any fees taxed on the proceeds of sale would probably be largely at their expense. The only other party holding a like priority are Seligman & Co., whose attor-

[Morton & Bliss v. N. O. & Selma Railway Co.]

neys are urging this allowance. These attorneys, as well as those of Robertson—the complainant in the original bill—have antagonized the claim of Gilman, Sons & Co., with uncommon diligence and vigor. The theory upon which Robertson's bill was based is the supposed invalidity of this claim, and of all others, as incumbrances upon the property in litigation. The chief effort of the learned solicitors of Morton & Bliss has been to overthrow the priority accorded to it by the first decision of this court in the cause. In proportion as the services of these attorneys have been valuable to their clients, they have been detrimental to the adversary party, whose rights they have assailed with such marked energy and perseverance. It is our judgment, that no allowance can be made out of the trust fund going to Gilman, Sons & Co., as attorney's fees for the applicants.

We will modify the decree, however, so as to allow the attorneys of Morton & Bliss to make application to the chancellor for the allowance to them of reasonable counsel fees out of any fund that may be left after paying the costs of suit, and discharging the claims of Gilman, Sons & Co., and that portion of the claim of Seligman & Co., which constitutes a first lien on the property in controversy, in the event that there may be a surplus going to those creditors who hold a second lien under the deed of trust executed to the Union Trust Company, and who come in under the cross-bill of Morton & Bliss and belong to the same class.

4. The rule which we have announced in the decree rendered in this cause, as to the distribution of the fund, is, in our opinion, unquestionably correct. Where bonds, or other evidences of debt, are secured by mortgage liens, on property of any description, and a fund is realized by a sale of such property, the established rule, universally adopted by courts of equity, is, that the distribution of it must be *pro rata* among lien-holders of equal priority, the surplus to be distributed in like manner among those coming next in order. This is perfectly equitable, and any other rule would be in disregard of the favorite maxim of courts of chancery, that "equality is equity." The principle invoked in the distribution of money among execution creditors at law has no application to cases like the present.—Colbrooke on Collat. Sec., § 159 ; 1 Story's Eq. Jur., §§ 554, 553. Nor is the rule different, because the first lien-holders derive their rights from a mortgage created by statute in favor of the State. Such a mortgage is nevertheless a contract lien, and not a pure statutory one, like that of a judgment or execution.